# IN THE UNITED STATES COURT OF APPEALS

# FOR THE FIFTH CIRCUIT

────────────

Nº 01-31486

────────────

NUOVO PIGNONE, SPA,

Plaintiff-Appellee,

VERSUS

STORMAN ASIA M/V, ETC., ET AL.,

Defendants,

FAGLIOLI SPA,
IN PERSONAM,

Defendant-Appellant.

────────────────────────

Appeal from the United States District Court
for the Eastern District of Louisiana

────────────────────────

October 31, 2002

Before SMITH and BENAVIDES, Circuit Judges, and FITZWATER,[*] District Judge.

JERRY E. SMITH, Circuit Judge:

Fagioli, S.A. ("Faglioli"), agreed to furnish a ship for the maritime transport of Nuovo Pignone, SpA's ("Nuovo Pignone's") 771,000 kilogram reactor from Italy to Louisiana. The reactor was damaged after arrival at the Port of New Orleans, and Nuovo Pignone sued. The district court found that Fagioli, an Italian company, was subject to personal jurisdiction in Louisiana and that Nuovo Pignone properly had effected service of process by mail. We affirm the assertion of personal jurisdiction but reverse the determination that article 10(a) of the Hague Convention permits service of process by mail.

I.

Fagioli is an Italian corporation providing worldwide transportation and logistical services necessary to transport heavy-lift cargo. Nuovo Pignone, also an Italian company, contracted with Fagioli for the transport of a large EO reactor from Italy to Louisiana. Under the terms of the contract, Fagioli was responsible for selecting a vessel for the transit.

The contract required that Fagioli furnish a ship possessing specified performance capabilities. Fagioli agreed to furnish a ship that "[h]as its own shears and winches and hoisting means, including swingletrees and cables for safe, autonomous hoisting operations and/or unloading in connection with the weight of the objects to be transported . . . ." The contract required that the ship be seaworthy, equipped with appropriate engines for navigation, and

[*] District Judge of the Northern District of Texas, sitting by designation.

capable of entering the pre-selected port of discharge.

Fagioli entered into a secondary contract with Blau Shipping & Trading, Ltd. ("Blau Shipping"). This contract, known as a conlinebooking note, specified that the vessel M/V STORMAN ASIA ("STORMAN ASIA") would be used to transport the reactor and that Geismar or New Orleans was the port of discharge. Blau Shipping then entered into a secondary conlinebooking note with Key Largo Transportes Maritimos ("Key Largo"), the owner and operator of the STORMAN ASIA. Nuovo Pignone's Louisiana client and Key Largo were responsible for unloading the reactor at the point of destination.

The reactor was loaded on board the STORMAN ASIA in Italy and transported across the Atlantic Ocean without incident. While the reactor was being transferred to a barge at the Port of New Orleans, one of the cables of the vessel's onboard shipping crane broke, causing the reactor to fall. The reactor and the deck of the barge were damaged. Nuovo Pignone alleges that the accident resulted from Fagioli's failure to provide a vessel with a satisfactory onboard shipping crane, as required by the original contract.

II.

Nuovo Pignone brought breach of contract and tort claims against Fagioli, Key Largo, and the STORMAN ASIA and effected service of process on Fagioli by sending the complaint and summons by Federal Express mail to Fagioli's president in Milan, Italy. Fagioli moved unsuccessfully to dismiss for lack of personal jurisdiction and insufficiency of process. The district court concluded that personal jurisdiction could be established over Fagioli because the company had made

minimum contacts with Louisiana through its contract with Nuovo Pignone, and that service by mail of foreign parties is permissible under article 10(a) of the Hague Convention. In its order denying the motion to dismiss, the district court, on Fagioli's motion, certified both grounds for interlocutory appeal under 28 U.S.C. § 1292(b), and this court granted leave to appeal as well.

## III.

We review *de novo* the district court's determination that its exercise of personal jurisdiction over a non-resident defendant is proper. *Wilson v. Belin*, 20 F.3d 644, 647-48 (5th Cir. 1994). Where, as here, the district court decides the motion to dismiss without holding an evidentiary hearing, Nuovo Pignone must make only a *prima facie* showing of the facts on which jurisdiction is predicated. *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). To decide whether a *prima facie* case exists, we must accept as true Nuovo Pignone's "uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation." *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir. 2000) (quoting *Alpine View*, 205 F.3d at 215).

The Due Process Clause of the Fourteenth Amendment protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful "contacts, ties, or relations." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945). In an admiralty case in which the cause of action arises out of the defendant's contact with Louisiana, a federal court may exercise personal jurisdiction over a foreign defendant if Louisiana could have acquired personal jurisdiction over the

defendant on the same cause of action and the exercise of jurisdiction comports with the Due Process Clause. *Adams v. Unione Mediterranea di Sicurta*, 220 F.3d 659, 667 (5th Cir. 2000). These two inquiries merge into one, because Louisiana's long-arm statute permits jurisdiction coterminous with the scope of the Due Process Clause. La. R.S. 13:3201(B); *Growden v. Ed Bowlin & Assocs.*, 733 F.2d 1149, 1150 (5th Cir. 1984).

In deciding whether personal jurisdiction is consistent with the Due Process Clause, a three-prong test is applied: (1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).[1]

## A.

A defendant establishes minimum contacts with a state if "the defendant's conduct and

---

[1] Federal Rule of Civil Procedure 4(k)(2) permits personal jurisdiction over foreign defendants for claims arising under federal law where the defendant has sufficient contacts with the nation as a whole, but insufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state. *World Tanker Carriers Corp. v. MV Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir. 1996). In *World Tanker*, we held that rule 4(k)(2) is applicable to admiralty claims. Nevertheless, neither party nor the district court addressed the issue of whether personal jurisdiction exists over Fagioli pursuant to rule 4(k)(2), so we will not discuss this possibility. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000).

3

connection with the forum state are such that [they] should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474 (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)). There must be some act whereby the defendant "purposely avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 475. A nonresident "may permissibly structure his primary conduct so as to avoid being haled into court in a particular state." *World-Wide Volkswagen*, 444 U.S. at 297. Even where a defendant has no physical presence in the forum state, a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact. *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222 (1957).

1.

We agree with the district court that Fagioli's agreement to supply a vessel equipped to allow for safe discharge of the reactor in Louisiana constituted a sufficient forum-related contact to confer personal jurisdiction. By agreeing to secure a vessel with a satisfactory onboard loading crane that it knew would be used to unload cargo in Louisiana, Fagioli reasonably should have anticipated that its failure to meet its contractual obligations might subject it to suit there. Fagioli cannot now claim that its contact with Louisiana was merely fortuitous, random, or attenuated after it entered into a contract specifying that state as the point of destination.[2] *Burger King*, 471 U.S.

_____

[2] For example, suppose that Fagioli had agreed to transport the reactor from Italy to Mexico, but because of bad weather, the STORMAN ASIA unexpectedly was forced to dock in the Port of New Orleans, where the accident occurred. In that case, (continued...)

at 475.

Fagioli argues that the district court misconstrued its contractual obligations, which it asserts did not require it to perform any part of the agreement in Louisiana.[3] Fagioli claims that it warranted only "that the ship had a crane of sufficient tonnage to lift the goods, not that the ship's crane would be in proper working order throughout the transport and unloading." In other words, Fagioli claims that its contractual obligations stopped on the shores of Italy.[4] It relies on the fact that Key

_____

[2](...continued)
Fagioli could not have reasonably foreseen being haled into a Louisiana court. Here, by contrast, Fagioli contracted with Nuovo Pignone to transport the reactor specifically to Louisiana.

[3] In arguing that it has insufficient contacts with Louisiana, Fagioli also relies on the fact that it is neither authorized to conduct business in Louisiana, nor does it maintain an office or employees there. Certainly, these facts cut against permitting *general* jurisdiction over Fagioli. But Fagioli's argument ignores the fact that personal jurisdiction may be established by either general jurisdiction or specific jurisdiction. *Alpine View*, 205 F.3d at 215. Nuovo Pignone argues only for *specific* jurisdiction. *Burger King*, 471 U.S. at 472 (stating that specific jurisdiction exists where the "litigation results from the alleged injuries that arise out of or relate to" the defendant's activities in the forum state) (internal quotations omitted).

[4] Fagioli relies on *Charia v. Cigarette Racing Team, Inc.*, 583 F.2d 184 (5th Cir. 1978), in which we found that a Florida boatbuilder who sent a completed boat to Louisiana via a third party carrier had insufficient contacts with Louisiana to effect personal jurisdiction. *Id.* at 189. Because *Charia* dealt with jurisdiction over a boatbuilder, and not a carrier such as Fagioli whose line of bus- (continued...)

4

Largo and Nuovo Pignone's client were the parties responsible for unloading the reactor when it arrived in Louisiana.[5]

Fagioli's argument that the district court misconstrued its contractual obligations is unavailing. Although Nuovo Pignone's client and Key Largo were responsible for unloading the reactor, Fagioli was the party that agreed to provide a satisfactory onboard crane and ultimately to transport the reactor to Louisiana. Because we are required to accept Nuovo Pignone's allegation that a defective onboard crane was the cause of damage to the reactor and barge, Fagioli cannot avoid personal jurisdiction by speculating as to whether another party was actually responsible for the accident. That question is left for a trial on the merits.

2.

In a broader sense, Fagioli should not be permitted to escape personal jurisdiction by in-

tertwining itself in a multi-layered contractual arrangement.[6] Effectively, Fagioli argues that because only third parties with which it subcontracted were dockside when the accident occurred, personal jurisdiction is unwarranted. Personal jurisdiction is not defeated, however, merely because Fagioli never set foot in Louisiana. *Burger King*, 471 U.S. at 476. As a voluntary member of the economic chain that brought the reactor to Louisiana, Fagioli purposely has availed itself of the privilege of conducting business in that state.

We have applied the stream-of-commerce principle to permit the assertion of personal jurisdiction over nonresident defendants that send a defective product into a forum.[7] Where a nonresident's contact with the forum state "stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has [specific] jurisdiction if it finds that the defendant delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state." *Bearry v. Beech Aircraft*

---

[4](...continued) iness requires that it regularly cross geographical boundaries, the case is inapposite. In any event, *Charia* was decided before several important Supreme Court cases, including *World-Wide Volkswagen*, 444 U.S. 286, and *Burger King*, 471 U.S. 462, had been decided.

[5] In its brief, Fagioli makes a passing reference to the use of the incoterm "CFR" in the Nuovo Pignone-Fagioli contract. Incoterms are standard trade definitions used in international sales contracts. *E.g.*, *Texful Textile Ltd. v. Cotton Exp. Textile, Inc.*, 891 F. Supp. 1381, 1388 n.6 (C.D. Cal. 1995). Importantly, incoterms are used only to allocate risk between buyers and sellers. William V. Roth, Jr. & William V. Roth III, Incoterms: Facilitating Trade in the Asian Pacific, 18 U. Pa. J. Int'l Econ. L. 731, 733 n.5 (1997). They do not apply to contracts between merchants and carriers, such as those in this case. *Id.*

[6] *See CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1266 (6th Cir. 1996) (stating that "it could be unfair to allow individuals who purposefully engage in interstate activities for profit to escape having to account in other states for the proximate consequences of those activities"); *Dakota Indus. v. Ever Best Ltd.*, 28 F.3d 910, 915 (8th Cir. 1994) ("A seller in a distribution network that realizes economic benefit from multiple sales in a distant fora purposely avails itself to the fora states' jurisdiction.").

[7] *E.g.*, *Ruston Gas Turbines v. Donaldson, Co.*, 9 F.3d 415, 420-21 (5th Cir. 1993); *Bean Dredging Corp. v. Dredge Tech. Corp.*, 744 F.2d 1081, 1083-84 (5th Cir. 1984).

*Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) (citing *World-Wide Volkswagen*, 444 U.S. at 298).[8]

The stream-of-commerce principle is applied to companies that, like Fagioli, "purposefully serve markets broader than the states in which [their] initial or direct sales are made." *Petroleum Helicopters, Inc. v. Avco Corp.*, 804 F.2d 1367, 1370 (5th Cir. 1987) (en banc). Still, this court has been reluctant to extend the stream-of-commerce principle outside the context of products liability cases. *Alpine View*, 205 F.3d at 216.

Where we have been presented with the opportunity to extend the principle to other areas such as contract or copyright, we have found the defendant's delivery of products into the stream-of-commerce to be unrelated to the cause of action.[9] Even where such a rela

tion exists, at least one member of the court has expressed concern that the public policy concerns compelling the application of the stream-of-commerce principle in products liability cases are not present in contract cases, where parties have direct contact and can structure their relationship in light of jurisdictional considerations. *See Gulf Consolidated Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1079 (5th Cir. 1990) (Reavley, J., dissenting).

Nevertheless, in *Gulf Consolidated*, 898 F.2d at 1073-74, we applied the stream-of-commerce principle in a breach of warranty action. The defendant was a Greek distributor that sent, to a Texas purchaser, defective oilfield casings that later were incorporated into pipe. *Id.* at 1072-74. In finding that the defendant should have foreseen the possibility of being haled into a Texas court, we observed that "[a]lthough the transaction . . . took place in Greece, the defendant sold the pipe in anticipation that it would be shipped to Texas aboard a ship it chartered." *Id.* at 1074. We found that Texas had an interest in providing a forum for the litigation where "the product was intended for use in Texas, [and] where the defect surfaced in Texas." *Id.*

Application of the stream-of-commerce principle is warranted here. The onboard shipping crane, like the casings in *Gulf Consolidated*, is alleged to have caused damage in the home forum. Like defendants in products liability cases that utilize the stream-of-commerce principle, Faglioli did not contract with a citizen of the home forum, but rather with third party intermediaries who

---

[8] This court has taken a relatively expansive view of the stream-of-commerce principle by requiring only "mere foreseeability" that a defendant might be haled into court because it has purposely availed itself of the privileges of conducting business in the home forum; we have not required that a defendant "purposely direct" its activities toward the forum. *Ruston Gas Turbines*, 9 F.3d at 419 (citations omitted).

[9] *See Alpine View*, 205 F.3d at 217 (declining to apply stream-of-commerce principle because the plaintiffs had "failed to make a prima facie showing that the litigation results from alleged injuries that arise out of or relate to" defendant's contacts with the forum) (internal quotation omitted); *Ham v. La Cienega Music Co.*, 4 F.3d 413, 416 (5th Cir. 1993) (finding that defendant's activities, though connecting them to Texas within the meaning of the stream-of-commerce principle, were insufficient to support jurisdiction given the (continued...)

[9](...continued)
"highly attenuated" relationship between the litigation and those activities).

brought the crane to Louisiana. Fagioli should have considered the possible devastation that its choice of a defective onboard crane might cause in Louisiana. In this sense, the same public policy concerns that justify use of the stream-of-commerce principle in the products liability context are present here.

### B.

We next turn briefly to whether Nuovo Pignone's claims arise out of Fagioli's contacts with Louisiana. *Burger King*, 471 U.S. at 472. We have established that Fagioli directed its activities toward Louisiana by agreeing to transport the reactor to the Port of New Orleans. Nuovo Pignone alleges that the reactor was dropped as a direct result of Fagioli's failure to provide a vessel with "safe autonomous hoisting operations." Therefore, Nuovo Pignone's claims necessarily arise out of Fagioli's contact with Louisiana.

### C.

Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable. *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). The defendant must make a "compelling case." *Burger King*, 471 U.S. at 477. In determining whether the exercise of jurisdiction is fair and reasonable, we look to (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies. *Felch v. Transportes Lar-Mex SA de CV*, 92 F.3d 320, 324 (5th Cir. 1996). Fagioli argues only that subjecting it to suit in Louisiana would be overly burdensome and that Louisiana lacks interest in hearing the suit.

In *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 115 (1987), the Court noted that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." The Court was concerned with the "unique burdens placed upon one who must defend oneself in a foreign legal system." *Id.* at 114. Fagioli does not present any reason why subjecting it to suit in Louisiana would be overly burdensome. In fact, Fagioli presents itself as a specialist in "worldwide transport and logistics" that maintains offices in the United States.[10]

As for Louisiana's interest in adjudicating a dispute between two Italian companies, the district court correctly concluded that "Louisiana has an interest in redressing the injury based on the failure of the equipment in unloading the reactor in New Orleans."[11] Although in *Asahi*, the Court questioned California's interest in maintaining an indemnification suit between two foreign parties, 480 U.S. at 115, here Nuovo Pignone alleges that damage to the reactor was caused by Fagioli's "negligence, fault, breach of duty, or breach of contract or warranty." Unlike the situation in *Asahi*, where the underlying tor-

---

[10] *See Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 716 (5th Cir. 1999) (rejecting Mexican company's claim that subjecting it to suit in the United States would be overly burdensome where the company had engaged in "numerous business dealings in the United States").

[11] *See Petroleum Helicopters*, 804 F.2d at 1371 (noting that the "location of the accident affects Louisiana's interest in adjudicating the dispute").

tious conduct giving rise to an indemnification claim occurred in Japan and the Republic of China, this case is one in which the plaintiff alleges the commission of a tort within the forum. Louisiana undoubtedly has an interest in ensuring the safety of its waterways.

## IV.

Nuovo Pignone effected service of process by sending a copy of the complaint by Federal Express mail to Fagioli's president in Milan, Italy. Fagioli argues that service by mail violates FED. R. CIV. P. 4(f)(1), which permits service of process on a foreign corporation "by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention." The Hague Convention is a multinational treaty formed in 1965 for the purpose of creating an "appropriate means to ensure that judicial and extrajudicial documents to be served abroad shall be brought to the notice of the addressee in sufficient time."[12] The treaty seeks not only to simplify and expedite international service of process, but more importantly, to ensure that service is effected timely and adequately.

The Hague Convention sets forth permissible methods of effecting service. Articles 2 through 7 require each signatory nation to establish a "Central Authority" to act as an agent to receive request of service, arrange for service of documents, and return proofs of service. Article 8 permits the use of diplomatic agents to serve foreign defendants. Article 9 permits diplomatic agents to forward documents to designated authorities in

receiving nations who, in turn, effect service on the proper parties.[13]

The parties disagree over the interpretation of article 10(a), which states in context:

Provided the State of designation does not object, the present Convention does not interfere with

(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of designation,

(c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination.

Nuovo Pignone contends that article 10(a) permits service of process by mail. Fagioli argues that the subsection refers only to the transmission of legal documents following service, pointing to the fact that nowhere else in the Hague Convention is the word "send" used to refer to service of process; rather, the drafters use the words "serve," "service," and "to effect service" in other sections, including subparts (b) and (c) of article 10.

---

[12] Convention on Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 362 T.I.A.S. No. 6638, *reprinted in* 28 U.S.C.A. FED. R. CIV. P. 4, note, at 210 (1992).

---

[13] In addition, Article 11 allows two signatories to agree to other methods not specified in the Convention.

The parties' differing positions reflect a circuit split over an issue this court has yet to address. Those courts that have concluded that article 10(a) permits service of foreign parties by mail have looked to the broad purpose of the Hague ConventionSSfacilitating service abroadSSand concluded that article 10(a) would be "superfluous unless it was related to the sending of such documents for the purpose of service."[14] These courts have opined that the use of the term send, rather than service, in article 10(a) should be attributed to careless drafting.

Other courts have held that the word "send" in article 10(a) is not the equivalent of service of process.[15] These courts have interpreted article 10(a) as providing a method for sending subsequent documents after service of process has properly been obtained. Despite the broad purpose of the Hague Convention, these courts have noted that the word "service" is used in other sections of the Hague Convention, including subparts (b) and (c) of article 10 and articles 9, 15, and 16, which all refer to forwarding documents for the purpose of service. So, if the drafters had meant for article 10(a) to provide an additional manner of service of judicial documents, they would have used "service" instead of "send."

We adopt the reasoning of courts that have decided that the Hague Convention does not permit service by mail. In doing so, we rely on the canons of statutory interpretation rather than the fickle presumption that the drafters' use of the word "send" was a mere oversight. "Absent a clearly expressed legislative intention to the contrary," a statute's language "must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). And because the drafters purposely elected to use forms of the word "service" throughout the Hague Convention, while confining use of the word "send" to article 10(a), we will not presume that the drafters intended to give the same meaning to "send" that they intended to give to "service."[16]

Nuovo Pignone's contention that the broad purpose of the Hague Convention is furthered if article 10(a) is interpreted to allow service by mail is problematic. As noted, the purpose of the Hague Convention is not only to simplify the service of process, but to ensure that plaintiffs deliver notice to foreign addressees in sufficient time to defend the allegation. Indeed, FED. R. CIV. P. 4(f)(1) presumes that the Hague Convention provides methods of service "reasonably calculated to give notice."

We are not confident, nor should the drafters have been confident in 1967, that mail service in the more than forty signatories is

---

[14] *Ackermann v. Levine*, 788 F.2d 830, 839 (2d Cir. 1986) (quoting *Shoei Kako v. Superior Court*, 33 Cal. App. 3d 808, 109 Cal. Rptr. 402 (1973)); *see also Koehler v. Dodwell*, 152 F.3d 304, 307-08 (4th Cir. 1998); *Smith v. Dainichi Kinzoku Kogyo Co.*, 680 F. Supp. 847, 850 (W.D. Tex. 1998).

[15] *Bankston v. Toyota Motor Corp.*, 889 F.2d 172, 173-74 (8th Cir. 1989); *see also Postal v. Princess Cruises, Inc.*, 163 F.R.D. 497, 500 (N.D. Tex. 1995); *Pennebaker v. Kawasaki Motors Corp.*, 155 F.R.D. 153, 157 (S.D. Miss. 1994).

[16] In *Russello v. United States*, 464 U.S. 16, 23 (1983), the Court noted that where a legislative body "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that the [legislative body] acts intentionally and purposely in the disparate inclusion or exclusion."

sufficient to ensure this goal.[17]  Under Nuovo Pignone's interpretation of article 10(a), the fact that a signatory could object to service by mail is unconvincing.  There is no reason to think that signatories with inadequate mail services would voluntarily opt out of article 10(a).

Finally, we note that other provisions of the Hague Convention describe more reliable methods of effecting service.  Service of process through a central authority under articles 2 through 7 and service through diplomatic channels under articles 8 and 9 require that service be effected through official government channels.  It is unlikely that the drafters would have put in place these methods of service requiring the direct participation of government officials, while simultaneously permitting the uncertainties of service by mail.

We conclude that article 10(a) does not permit parties to effect service of process on foreign defendants by mail.  On remand, Nuovo Pignone should be permitted a reasonable time to effect service properly.  *Jim Fox Enter., Inc. v. Air France*, 664 F.2d 63, 65 (5th Cir. Dec. 1981).

For the reasons we have explained, the district court's assertion of personal jurisdiction over Fagioli is AFFIRMED, and its determination that service of process by mail is permissible under the Hague Convention is REVERSED. This matter is REMANDED for further proceedings.

---

[17] Indeed, the advisory committee notes to the 1963 amendments to FED. R. CIV. P. 4 recognize that "[s]ervice of process beyond the territorial limits of the United States may involve difficulties not encountered in the case of domestic service."