Steven Henry Arthur ADAMS, et al.

v.

**UNIONE MEDITERRANEA DI SICURTA, et al.**

No. CIV.A.94–1954.

United States District Court, E.D. Louisiana.

Nov. 27, 2002.

John Donellan Fitzmorris, Jr., Francis A. Courtenay, Jr., Donald J. Volpi, Jr., Kirk Norris Aurandt, Courtenay, Hunter & Fontana, New Orleans, LA, Jon Daniel Picou, Lee M. Peacocke, Larzelere, Picou & Wells, LLC, Metairie, LA, for Plaintiffs.

Robert Taylor Lemon, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Place St. Charles, James K. Carroll, Richard A. Fraser, III, Gelpi Sullivan Carroll, Paul C. Miniclier, David A. Binegar, The Law Office of Paul C. Miniclier, New Orleans, LA, Alfred R. Gould, Jr., Aubert & Pajares, LLC, Covington, LA, Priscilla M. Schwartz, Priscilla M. Schwartz, Attorney at Law, Metairie, LA, Christopher Ogilvie Davis, George W. Healy, III, Rebecca Y. Cooper, Phelps Dunbar, LLP, New Orleans, LA, Robin C. Minturn, Robin C. Minturn, Attorney at Law, Nashville, TN, Robert I. Siegel, Nathan L. Schrantz, Hoffman, Siegel, Seydel, Bienvenu, Centola & Cordes, APLC, New Orleans, LA, for Defendants.

## ORDER AND REASONS

DUVAL, District Judge.

On August 14, 2000, the United States Court of Appeals for the Fifth Circuit, remanded this matter to this Court to determine whether the Court has personal jurisdiction over UMS Generali Marine S.p.A. (formerly known as Unione Mediterranea di Sicurta and referred to as "UMS") rejecting this Court's finding at trial on the matter that UMS had waived its personal jurisdiction defenses. On remand, a number of motions were filed, including a Motion to Dismiss filed by UMS which motion was denied because of a lack of critical factual information necessary to make a comprehensive jurisdictional finding. The Court ordered briefing to be submitted to the Court, and after extensive discovery was had, supplemental briefing on the issue of personal jurisdiction has been filed. The Court is now prepared to determine whether it has personal jurisdiction over UMS as ordered by the appellate court.

The facts that give rise to this dispute are comprehensively set forth in *Adams v. Unione Mediterranea Di Sicurta*, 220 F.3d 659, 664–65 (5th Cir.2000) and are adopted by the Court. For purposes of this ruling Court will focus on those necessary facts as supplemented by the briefing, exhibits, and deposition testimony which have been filed to augment the record to determine the jurisdictional issue. The

gravamen of this controversy centers on certain steel cargo owned by Duferco, S.A. ("Duferco"), insured by UMS, which was shipped from Italy, on September 16, 1993, aboard the M/V TURANDOT. It arrived in Darrow, Louisiana, for unloading onto various barges, including barge numbers CBX–207 and CBX–214, for transportation to its final destination, Cincinnati, Ohio. Canal Barge Company, Inc. ("Canal Barge"), a Louisiana corporation and the barge carrier, had obtained cargo insurance on the steel slabs from plaintiffs, Steven Henry Arthur Adams, and Certain Underwriters at Lloyds ("London Underwriters"). The shipment of steel was offloaded and placed on the barges by the Louisiana -based Cooper/T. Smith, Inc. On October 12, 1993, under tow by the Tug BILL ANDREWS owned and/or operated by Canal Barge (UMS Answer, Rec. Doc. 83), the barges set course upriver. On or about October 16, 1993, Barges CBX–207 AND CBX–214 sank. The cargo aboard those two barges was lost and is the subject of this dispute. A.K. Steel Corporation, who was the original intended purchaser, purchased the salvaged cargo.

This Court has not held an evidentiary hearing on jurisdiction; rather, it simply ordered briefing which has resulted in the filing of a number of affidavits, deposition testimony, exhibits and other evidence.[1] "When a district court decides a motion to dismiss without holding an evidentiary hearing, plaintiff must make only a *prima*

---

[1.] The Fifth Circuit intimated that this Court had a "hearing" on the jurisdiction issue. *See Adams*, 220 F.3d 659, 670 n. 10. For the sake of clarity, only **oral argument** on UMS's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. 33), Canal Barge Co., Inc.'s Motion for Summary Judgment (Doc. 37) and London Underwriters' Motion to Compel Substitution of Real Party in Interest (Doc. 38) was conducted on November 29, 1995. **No testimony was received.** As such, a "full evidentiary hearing" was not held then and to

date has not been. Thus, the plaintiff's burden is met by the presentation of a *prima facie* case for personal jurisdiction. *DeMelo v. Toche Marine Inc.*, 711 F.2d 1260 (5th Cir. 1983); *see also Data Disc. Inc. v. Systems Technology Assoc., Inc.*, 557 F.2d 1280 (9th Cir.1977). (if court determines it will only receive affidavits or affidavits plus discovery materials, these limitations dictate a plaintiff must make only a prima facie showing of jurisdiction).

*facie* showing of the facts on which jurisdiction is predicated." *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 378(5th Cir.2002). The Fifth Circuited continued, "To decide whether a *prima facie* case exists, we must accept as true [plaintiff's] 'uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation.'" *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 854 (5th Cir.2000). The Court will now, based on that standard, examine the background facts that will guide it in making its determination with respect to jurisdiction.

## BACKGROUND

### UMS Contacts–In General

UMS is apparently the second largest cargo insurer in Italy. It has a single office located in Genoa, Italy. All of its employees and physical assets are located in that office. (London Underwriters, Exh. B, Dep. of Luigi Giovannini, at 9–11).[2] UMS maintains that it has, *inter alia*, (1) never stipulated an insurance contract in the United States; (2) it never has qualified to do business in the United States; (3) has never appointed an agent for service of process in the United States; (4) it does not maintain an office, post office box, address, telephone or telephone listing in the United States; (5) it does not own, or lease any real or personal property in the United States. (Doc 418, UMS Supple-

mental Memorandum, Ex. "B").[3] Nonetheless, UMS insures cargo shipped by sea, land or air throughout the world. (London Underwriters, Exh. A, Dep. of Gianmario Rocca at 27).

It is unclear what percentage of UMS's income from 1991 through 1994 was generated by insuring cargo that was destined for United States ports. With respect to Duferco alone, UMS provided coverage for approximately 95 shipments to Louisiana between 1989 and 1995. Between 1991 and 1994, there are certificates of insurance demonstrating 39 Duferco steel shipments through New Orleans. (A.K. Steel Exh. 12, Duferco Certificates of Insurance). The insured value of these shipments totals over $39 million.

From March 20, 1991, through July 14, 1994, UMS made 40 wire transfers to entities located in the United States who were designated as *"commissar d'avaria."* (London Underwriters, Exh. "K"). The literal translation of these two words is "damage assessor" (Rocca at 44)[4]. It appears to the Court from the deposition testimony and exhibits that these are law firms or companies that were and are hired by UMS and paid in the United States. These entities basically adjust claims; they retain surveyors, handle the salvage of the cargo, and the like.

For example, Italian Claims Agency, Inc. ("ICA") assesses damage, hires sur-

**2.** All exhibit references unless otherwise noted are to exhibits filed in conjunction with the memoranda presented on remand.

**3.** In the same affidavit, UMS maintains that it has no correspondents in the United States, that it never employed any agents, servants or employees in the United States. These affirmations have been contradicted by other evidence presented, and as explained earlier the Court must give credence to the opposing evidence in that regard at this time.

**4.** The UMS internet cite translates this term to "claims agents" and states that "in case of need, you will be able to identify rapidly the Average Adjuster nearest to the place of the occurrence and/or where the goods involved are held, to ask him to step in immediately in accordance with the policy." (A.K.Steel, Exh. 6). This advertisement certainly indicates an on-going relationship with U.S.-based agents for purposes of dealing with claims arising out of UMS's insurance policies.

veyors and collects the necessary paperwork that is then sent to the client. Victor Bruzzone, the secretary and vice-president of ICA, testified in his deposition that he does not consider himself to be a surveyor, an adjustor or a claims agent, but an "accumulator." (London Underwriters, Exh. "D", pp. 11–13). Another company listed as a *commissar d'avaria* was Transatlantic Marine Claims Agency. David Tan, its president testified that it has worked for UMS for the last decade. Transatlantic Marine Claims Agency is authorized to retain the services of claims adjusters, attorneys and surveyors to handle a case, including retaining experts, without contacting UMS for permission. They are authorized to execute receipt and releases on its behalf. (London Underwriters, Exh. F. pp. 3–5). In addition, UMS apparently uses three experts based in Italy in processing its claims investigations. These persons are Captain Cappato, Engineer Menini and Dr. Cambiaso. (Dep. of Rocca pp. 37–38). Captain Cappato was involved in resolving the cargo claim at issue herein.

In addition, it appears that 137 claims were paid to the United States from 1991 to 1994. (London Underwriters, Exh. M). The primary beneficiaries were Tad U.S.A., Inc. and Duferco Steel, Inc., a subsidiary of Duferco, S.A. located in Lawrence, New Jersey. There are a number of other insureds in the United States as well. These entities are Galaxy Management, Global Lanes International Corp. Abstoss International Steel, Inc. and Thyssen Steel. (London Underwriters, Exh. "N" *in globo)*.

**Specific Contacts With Respect to the Instant Claim**

**The Policy**

UMS issued to Duferco, S.A. ("Duferco") an open cargo policy of insurance, Open Cover No. 1381/111 on August 8, 1993. It was for a 12 month term from June 1, 1993 to May 31, 1994. (A.K. Steel Exh. 4, Policy, Art. 18) (hereinafter "Policy"). It granted coverage to all shipments of siderurgical products for which Duferco was required to obtain insurance. (Policy, Art. 1).

As such, Duferco was required to:

declare each risk hereto by telex or telefax; these declarations must be sent before the sailing date and should contain details of the shipment, such as name of the vessel, voyage, sailing date, kind of cargo, approximate quantity and insured value, together with the insurance conditions requested.

(Policy, Art. 4).

An addendum to subject open cargo policy also states:

By the present addendum, forming part of the above mentioned policy, it is noted and agreed that, as partial amendment of what provided by Articles 11 and 12, it is agreed that: after discharge overside from the overseas vessel at ocean discharging port, the goods have to be re-forwarded to the final destination by means of barge, pontoon or similar means, under a separate carriage contract, a condition of this insurance is that a Surveyor, to be agreed by Underwriters, must attend to the cargo loading on barges, to ascertain the conditions of the means of conveyance and the suitability of the stowage effect on board of the same.

In case of non intervention of Surveyor at re-loading, no claim shall be recoverable hereunder.

(Policy, "DI 1381/111—App. 1"). Thus, under the very terms of this policy, UMS contemplated being involved in the actual transshipment of the cargo and requiring the approval by its agent of such stowage. It is interesting to note that this provision

at one point in this litigation was invoked as a policy defense; UMS contended at one time that Duferco's failure to obtain such a surveyor vitiated coverage. It subsequently dropped this defense.

### Duferco/UMS Negotiation of Quote for Subject Insurance

With respect to the subject insurance, a fax dated August 24, 1993, was sent from Mr. Michelini of Duferco in Lugano, Switzerland to Mr. Morino of UMS in which it was confirmed that the terms of the relevant contract were CIF with duty paid delivery to Cincinnati, Ohio. (London Underwriters, Exh. C, Dep. of Arturo Michelini, p. 11 and 14.). That fax to UMS states specifically:

FOLLOWING TELCON CONFIRM YOU WE BOUGHT 150,000 MT APPROX OF SLABS FROM ILVA SOLD TO BETHLEHEM STEEL ON CONSIGNEMENT BASIS MEANING MATERIAL WILL BE SHIPPED AND WILL BE PLACED INTO A STOCKAGE AREA AND WILL REMAIN THERE UNDER THE NAME OF DUFERCO.

．　　　．　　　．　　　．　　　．

WE WILL PLACE MATERIAL INTO TWO DIFFERENT STOCKAGE AERA(SIC) DEPENDING THE WAY WE SHIP IT MEANING FOR THOSE QUANTITIES WHICH WILL GO VIA OCEAN VESSEL FROM TARANTO TO PORT OF INDIANA (CHICAGO) DIRECTLY MATERIAL WILL BE STOCKED INTO A WAREHOUSE ON PORT OF INDIANA WHILE FOR SHIPMENTS WHEREBY OCEAN VESSELS WILL GO FROM TARANTO TO NEW ORLEANS AND THEN MATERIAL WILL PROCEED TO LAKES DESTINATION VIA BARGE WILL BE STOCKED AT BETHLEHEM BURNS HARBOUR PLANT BECAUSE AS I EXPLAINED YOU BARGES WILL GO DIRECTLY TO BETHLEHEM PLANT. AS FAR AS SECURITY OF MATERIAL WE HAVE A UCC1 FILING DONE THOUGH OUR LAWYER. WE NEED TO PREPARE AN INSURANCE CERTIFICATE ISSUED TO THE ORDER OF BANK FINANCING BUSINESS COVERING OCEAN VOYAGE + BARGE VOYAGE (WHERE NECESSARY) AND 4/5 MONTHS IN STOCKAGE AREA AS INDICATED ABOVE.

．　　　．　　　．　　　．　　　．

PLEASE COMMENT ADVISING SUGGESTED PREMIUM TO BE APPLIED KEEPING IN MIND WE ARE TALKING OF STEEL SLABS WHICH IS MATERIAL FOR WHICH ONLY EXCEPTION NATURAL EVENT COULD ENDUP TO A CLAIM.

(London Underwriters, Exh. S). A fax dated August 26, 1993, outlining terms in Italian for such coverage was then sent to Duferco. Duferco confirmed its agreement to the conditions shown on the UMS fax of August 26, 1993 by fax on September 8, 1993. Thus, it is evident that the two parties specifically consulted with respect to insurance coverage for the subject voyage and the cost of that coverage was specifically negotiated. The argument that UMS was unaware of the circumstances of this voyage and the specific coverage for the subject steel slabs is without foundation in the evidence presented to the Court.

In addition, a Certificate of Insurance was issued that used standard language for a CIF delivery. The certificate is required for the issuing of a Letter of Credit to be used in the cargo transaction itself. Regardless of who actually issued the certificate, a copy thereof is required to be

transmitted to UMS under Italian law. (Dep. of Rocca, pp. 45–48).

**The Voyage**

Indeed, as described in the fax to UMS, the subject cargo made its way to Darrow, Louisiana. The cargo was offloaded by a Louisiana stevedore onto barges owned and operated by a Louisiana company, proceeded upriver through Louisiana, was pushed by a towboat owned and/or operated by Canal Barge, a Louisiana company, and sank in the Mississippi River.

Where the barges actually sank and the location of the lost cargo when it was salvaged has been the subject of much debate.[5] With the record before the Court, the Court finds that for purposes of its jurisdictional analysis, the cargo sank on the Louisiana side of the Mississippi. This finding is based on the position as calculated by plaintiff's counsel using the U.S. Coast Guard Report of Marine Accident, Injury or Death of October 16, 1993, and the bearings described therein. (Doc. 335, Ex. 1, Affidavit and docs. attached). While UMS disagrees with the findings contained in the affidavit, the Court must accept this affidavit as true at this point in time. *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d at 854.

The Court will now apply these facts to the relevant legal standards.

## PERSONAL JURISDICTION ANALYSIS

■ A federal court sitting in diversity may assert personal jurisdiction if (1) the state's long-arm statute applies, as interpreted by the state's courts; and (2) if due process is satisfied under the Fourteenth Amendment to the United States

Constitution. *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir.1989). As noted, London Underwriters bear the burden of making a *prima facie* showing of sufficient contacts to establish personal jurisdiction over the nonresident. *Bullion v. Gillespie*, 895 F.2d 213 (5th Cir.1990).

### Application of Louisiana's Long Arm Statute

■ A federal district court sitting in diversity may exercise personal jurisdiction only to the extent permitted a state court under applicable state law. *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir.1997). The Louisiana long-arm statute extends personal jurisdiction to the maximum limits permitted by due process. *Pedelahore v. Astropark, Inc.*, 745 F.2d 346, 348 (5th Cir.), *reh. denied, en banc*, 751 F.2d 1258 (5th Cir.1984). Due process advances a two-pronged test in order for the Court to exercise jurisdiction: (1) the nonresident must have minimal contacts with the forum state and (2) subjecting the nonresident to jurisdiction must be consistent with traditional notions of fair play. *Id.* at 348; *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Minimum contacts with the forum state can arise incident to either "specific jurisdiction" or "general jurisdiction." The Supreme Court gave its approval to this distinction in the seminal case, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Lawrence W. Moore, S.J., *The Relatedness Problem in Specific Jurisdiction*, 37 Idaho L.Rev. 583 (2001). "Inchoate hints of this distinction are nonetheless

---

**5.** A.K. Steel took the position that because the cargo that is the subject of this suit was located in the riverbed of the Mississippi River that was owned by the State of Mississippi, Mississippi state law applied to certain legal

issues presented rather than admiralty law, the Court found that this position did not constitute a judicial admission. (Rec.Doc. 368).

found in *International Shoe.*" *Id.* at 326 n. 2, 66 S.Ct at 163 n. 2. "Specific jurisdiction is appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action." *Felch v. Transportes Lar–Mex SA De CV,* 92 F.3d 320, 324 (5th Cir.1996), *citing Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.), *cert. denied,* 513 U.S. 930, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994). Indeed, "[a] single act, by the defendant directed at the forum state, therefore, can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted." *Ruston Gas Turbines, Inc. v. Donaldson Co.,* 9 F.3d 415, 417 (5th Cir. 1993).

### Specific Jurisdiction-"Related to or Arising Out Of" in the Context of an Open Cargo Policy of Insurance

UMS takes the position that because the only "intersection" between UMS and the State of Louisiana was that (1) UMS insured cargo, (2) that was unloaded in Louisiana, (3) onto barges owned by a Louisiana company for transportation to Ohio, there are insufficient contacts for jurisdiction to attach. It maintains that the fact that the cargo "briefly paused in the State of Louisiana is the type of random, fortuitous and attenuated contact which the Supreme Court has rejected as a basis for jurisdiction." For this proposition UMS relies primarily on a district court case, *Young v. Britannia Steam Ship Ins. Assoc., Ltd.,* 1994 WL 320972 (E.D.La. June 29, 1994), and *Travelers Indem. Co. v. Calvert Fire Ins. Co.,* 798 F.2d 826 (5th Cir.1986). However, the Court is not persuaded by UMS's argument. While UMS tries to persuade the Court that *Calvert* stands for the proposition that the mere insuring of cargo that may enter a port does not provide sufficient contacts with that port to provide jurisdiction, *Calvert* does not provide such a clear cut rule.

Indeed, the facts inexorably demonstrate that UMS's contacts with Louisiana are directly related to the cause of action.

In *Calvert,* a Panamanian cargo ship, S/S EURYBATES, collided with a United States naval destroyer in international waters off the Panama Canal. Both ships were damaged as well as the cargo on the Panamanian vessel. Calvert Fire Insurance Company ("Calvert") was the lead Hull Underwriter. Liability coverage respecting cargo aboard the EURYBATES was provided under a mutual protection and indemnity policy ("P & I policy") issued to the vessel's owner through The London Club. The owner of the vessel filed a limitation of liability action in the United States District Court for the Eastern District of Louisiana. Ultimately, Travelers was the surety on the bond filed to prevent the seizing of the EURYBATES in that litigation; Travelers relied on Hull Underwriters to indemnify it. The London Club was never made a party to the litigation.

In the limitation proceeding, the district court held the EURYBATES solely at fault for the collision. As a result, the EURYBATES was liable to cargo, and coverage that had been provided by the Hull Underwriters with respect to the cargo damage was then denied. As such, Hull Underwriters asserted that it was not liable for the bond covering the cargo loss paid by the Navy and refused to indemnify Travelers for the entire amount of the bond. Travelers was not made aware of the adverse decision against the EURYBATES, as it had not been an actual party in the limitation. Travelers sought to have the judgment reformed to make all the damages collision damages; however, that motion was denied.

Ultimately, Travelers sought to make the London Club, which had provided the cargo coverage, and the Hull Underwriters, parties to a subsequent declaratory

judgment action which it filed to "require Hull Underwriters to pay the entire amount of the bond, and alternatively to make the London Club pay for the cargo damages." *Calvert,* 798 at 830. The London Club asserted that the court lacked personal jurisdiction over it because the suit did not arise out of activities in Louisiana, and the London Club did not have sufficient contacts with Louisiana. The district court found it had personal jurisdiction; the Fifth Circuit reversed.

The appellate court found that Louisiana could not assert either specific or general jurisdiction over The London Club since the suit neither arose out of nor was related to any contacts of The London Club with Louisiana, and it did not have sufficient systematic contacts to justify general jurisdiction. The Fifth Circuit in so finding, however, did not reject two cases wherein jurisdiction over a cargo insurer was found; rather, it distinguished *Puerto Rico v. the SS Zoe Colocotroni,* 628 F.2d 652 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981) and *McKeithen v. M/T FROSTA,* 435 F.Supp. 572 (E.D.La.1977) on the facts of the case before it.

The *Colocotroni* case and its progeny stand for the proposition that:

[c]learly contracting to insure property located within a jurisdiction, even if the presence of that property is transitory, subjects a foreign marine-insurer to jurisdiction on suits over such insurance. *See Puerto Rico v. the SS Zoe Colocotroni,* 628 F.2d 652, 667–70 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981); *American & Foreign Ins. Ass'n v. Commercial Ins. Co.,* 575 F.2d 980, 982 (1st Cir. 1978); *Atlantic Lines, Ltd. v. M/V Domburgh,* 473 F.Supp. 700, 702–704 (S.D.Fla.1979).

*Armada Supply Inc. v. Wright,* 858 F.2d 842, 849 (2nd Cir.1988). As stated in the *Colocotroni* decision, an insurance company, unlike a company that sells a product into a stream of commerce, has control over its product. It can through its contracts of insurance meaningfully influence and control the course taken by insured vessels or insured cargo. By limiting coverage to specified jurisdictions, an insurance company can be reasonably certain the it would not be hailed into court in an undesired forum. "In other words, an insurer is not at the mercy of the insured owner's unilateral choice of destination in the same way a seller of chattels is at the mercy of the buyer." *Colocotroni,* 628 F.2d at 670.

In addition, "the Supreme Court has occasionally suggested that the test for measuring minimum contacts for insurance companies may be somewhat less stringent than for other nonresident corporations." *Andreyev v. Sealink, Inc.,* 143 F.Supp.2d 192, 198 (D.Puerto Rico 2001) *citing Colocotroni,* 628 F.2d at 670 n. 18. "In cases against insurance companies, the forum state has a high public policy interest in promoting effective redress of injuries." *Id.*

 It is beyond cavil that UMS in the case at bar had knowledge that the subject cargo was to pass through and be transshipped onto barges in Louisiana. The aforementioned faxes and telexes demonstrate that explicitly. Thus, UMS placed its product, insurance coverage, into the stream of commerce by insuring a product that it knew was destined for transshipment in Louisiana. *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 420 (5th Cir.1993). Indeed, UMS's own contract of insurance required a surveyor to be present at the time of transshipment. To the degree that foreseeability is implicit in the requirement that there be a sub-

stantial connection between Louisiana and UMS, certainly, it was foreseeable to UMS that it might be required to defend a claim in Louisiana. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). Furthermore, clearly, the controversy at bar relates to and arises out of the coverage specifically extended to Duferco by virtue of the UMS open cargo policy of insurance. *See Amoco Oil Co. v. Phillipe Martin & Associes,* 811 F.Supp. 253, 255–56, *aff'd,* 998 F.2d 1013 (5th Cir.1993); *Chilean Nitrate Corp. v. M/V Hans Leonhardt,* 810 F.Supp. 732, 737 (E.D.La.1992); *Tropical Cruise Lines, S.A. v. Vesta Ins. Co.,* 1992 WL 392637 (S.D.Miss. May 6, 1992). Had UMS not wanted to be subject to suit in Louisiana, it was free to exclude coverage with respect to this area. It did not.

Additionally, as "minimum contacts" required for specific jurisdiction to attach is satisfied by actions by which the non-resident defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws," *Ruston.,* 9 F.3d at 419, *citing Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2183, n. 11, 85 L.Ed.2d 528 (1985), the evidence of the volume of cargo that UMS has provided to Duferco alone–95 shipments between 1989 and 1995, 39 steel shipments through New Orleans between 1991 and 1994 with a value of over $39 million-indicate its voluntary membership in the economic chain that brings it revenue by virtue of its business of insuring Louisiana bound cargo. *Nuovo Pignone v. Storman Asia M/V,* 310 F.3d 374 (5th Cir.2002). Moreover, the cargo was lost in Louisiana. If the cargo involved had been oil, as in the case of *Colocotroni,* and that oil had injured the drinking water of Louisianians, the impact would be clearer. Nonetheless, in light of the evidence, this fact further supports a finding of specific jurisdiction.

All of these facts inexorably distinguish this case from the facts presented in *Calvert.* No evidence was adduced that the insured vessel in *Calvert* either entered Louisiana waters during the voyage in question, or at any other time. The accident at issue in *Calvert* did not occur in Louisiana which fact the *Calvert* court deemed "of most significance" in rejecting specific jurisdiction in that case. There was no indication that the policy at issue in *Calvert* itself required informing the insurer of a voyage as was required with respect to cargo in the instant open cargo policy cited above. There was no proof advanced in *Calvert* as to the specific knowledge of the insurer as to the course the vessel insured was to take. Unlike the case at bar, there was no indication of any specific negotiation with respect to the cost of the cargo coverage including the specifics of the route and cargo path. In addition, no evidence was offered in *Calvert* relating to the number of vessels actually insured by The London Club that regularly traveled in Louisiana waters, or that there would be a transshipment of the cargo in the forum (New Orleans). With all of that noted, as *Calvert* acknowledged the possibility of finding specific jurisdiction in its reading of the *Colocotroni* case, this Court finds that there were sufficient acts by the defendant directed at Louisiana to confer personal jurisdiction because those acts gave rise to the instant claim being asserted. *Ruston Gas Turbines, Inc.,* 9 F.3d at 417.

The facts recited above clearly demonstrate that this controversy arises out of and relates to UMS's contacts with Louisiana. Illustratively, the cargo sank in Louisiana. The cargo was transshipped in Louisiana with UMS's specific knowledge. UMS insures a substantial amount of car-

go that goes through Louisiana, and it specifically chose to insure the subject cargo that was to pass through Louisiana. As such, specific jurisdiction arises over UMS.

### General Jurisdiction

■ As previously noted, exercise of general jurisdiction does not offend due process if there are sufficient contacts between the state and the foreign corporation. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984). Thus, general personal jurisdiction attaches, even if the nonresident defendant's contacts with the forum state are not directly related to the cause of action, if the defendant's contacts with the forum state are "continuous and systematic". *Felch v. Transportes Lar–Mex SA De CV,* 92 F.3d 320, 324 (5th Cir.1996).

■ In light of the evidence presented with respect to UMS's economic gain generated by its over-all business of insuring cargo bound for the Louisiana, the Court finds sufficient contacts. In *Calvert,* the appellate court found insufficient contacts to establish general jurisdiction because there was no evidence of the insurer covering any Louisiana resident, of a local firm acting as a general agent for the insurer, of insuring any Louisiana related risks, or that any insured vessels were "either based in Louisiana or engaged in other than strictly international commerce." *Calvert* 798 F.2d at 833. As this Court noted previously, *Adams v. Unione Mediterranea Di Sicurta,* 2001 WL 986867 (E.D.La. Aug. 27, 2001) at 3, this analysis was developed by contrasting the facts before it with those demonstrated in *McKeithen v. M/T Frosta,* 435 F.Supp. 572 (E.D.La.1977) (Rubin, J.). Judge Rubin found in *McKeithen* that a foreign insurer who regularly insures vessels entering Louisiana waters could be subject to jurisdiction in Louisiana based solely on that activity. In that case, 44 vessels entered the Port of New Orleans within the prior year, some of them several times. *Id.* at 574. Even though the foreign insurer had no contact with Louisiana other than through its insureds, Judge Rubin held that the foreign insurer transacted business in the state sufficient to establish personal jurisdiction by "regularly and repeatedly maintaining insurance on a host of vessel navigating Louisiana territorial waters." *Id.* at 580.

This Court finds no distinction between the insurer of vessels and the insurer of cargo. The volume of cargo that is insured by UMS that travels through the Port of New Orleans provides sufficient contacts with Louisiana for this Court to exercise jurisdiction. This finding is buttressed by the necessity for most cargo that has been shipped on ocean-going vessels to be trans-shipped onto barges in the Port of New Orleans. This activity within the geographical confines of the State of Louisiana makes the contacts that much greater and less "fortuitous." Louisiana has a vested interest in protecting itself, its waters and its port in light of this activity. Additionally, the subject policy of UMS requiring a surveyor at the trans-shipment point, which habitually occurs at the Port of New Orleans, adds to its contacts with the State. While there was some deposition testimony that that clause may not be enforced at the present time, the fact remains that the activity was contemplated at the time of the loss.

The case at bar can be distinguished from the *Young* decision. Unlike the facts in the *Young* decision, the insurance involved is cargo insurance not P & I coverage. As such, there is no indication that the insurer was apprised of the course of each voyage as UMS was apprised of the course of each shipment of covered cargo. Furthermore, the court in *Young* dis-

missed the analysis in *McKeithen* and *Co-locotroni* with respect to a general jurisdiction analysis in light of *Helicopteros*. However, those cases remain viable in light of the Fifth Circuit's analysis in *Calvert*.

**Traditional Notions of Fair Play and Substantial Justice.**

"Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Nuovo Pignone*, at 382 *citing Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215(5th Cir.1999). A compelling case must be made by the defendant. *Id.* To determine whether exercising jurisdiction over the defendants would not "offend traditional notions of fair play and substantial justice," *International Shoe*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, that is to say whether the exercise of jurisdiction is fair and reasonable, the Court should consider:

> the burden on the defendant, the interest of the forum State, and the plaintiff's interest in obtaining relief. [The court] must also weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies."

*Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 115, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987); *Nuovo Pignone* at 382 *citing Felch*, 92 F.3d at 324.

■ The Court finds that UMS has failed to demonstrate that the exercise by this Court of jurisdiction over UMS to be overly burdensome. UMS is an international company that generates substantial income from insuring cargo that is discharged and trans-loaded in Louisiana. It has benefitted substantially from those contacts. It has paid 137 claims to insureds in the United States from 1991 to 1994. Although the discovery in this case was limited, it is fair for the Court to infer that many more claims have been paid since that time. This company has in place a network of *commissar d'avaria* to handle claims in the United States; indeed, it dispatched Captain Cappato to adjust the instant claim in Louisiana. The court in its previous discussion concerning minimum contacts has already underscored Louisiana's interest in this matter. Obviously, Louisiana has an interest in ensuring the safety of its waterways. *Nuovo Pignone*, at 382. Certainly, the parties seeking redress from UMS have a vested interest in maintaining the suit here as well. The tort that gave rise to this suit occurred in Louisiana. The Court is convinced that it is reasonable and fair to require UMS to litigate this matter in this forum.

Based on the foregoing, the Court finds that it has sufficient contacts to exercise personal jurisdiction over UMS.

**Personal Jurisdiction based on Federal Rule of Civil Procedure 4(k)(2) and the Fifth Amendment Due Process**

Because the Court has followed the instructions of the Fifth Circuit and has determined that there are sufficient contacts to support both specific and general jurisdiction in Louisiana over UMS, a Rule 4(k)(2) analysis would be inappropriate by the very terms of the rule. However, had the Court not so found, it appears that the Fifth Circuit in *World Tanker Carriers Corp. v. MV Ya Mawlaya*, 99 F.3d 717 (5th Cir.1996) has acknowledge that admiralty law provides a basis of the application of Rule 4(k)(2) and thus a district court could exercise jurisdiction based on a defendant's contacts with the United States as a whole where that defendant is not subject

to the jurisdiction of any state. Certainly, where there is proof of hundreds of instances where cargo insured by UMS has entered U.S. waters, where UMS has a system in place to adjust claims throughout the United States, has paid for the adjusting services of those persons in the United States, has paid claims in the United States and has insured property in the United States, such indices would be persuasive in demonstrating nation-wide contacts.

Finally, as the Court has found jurisdiction under the traditional specific/general jurisdiction rubric, there is no need to address London Underwriter's argument that under the admiralty law, UMS is subject to jurisdiction using the due process clause of the Fifth Amendment.

Accordingly, in compliance with the mandate of the United States Court of Appeals for the Fifth Circuit as outline in its decision of August 14, 2000, this Court finds that it has both specific and general jurisdiction over UMS. The judgment rendered in these proceedings dated August 3, 1998, was vacated as to London Underwriters's judgment against Britamco Underwriters, Inc. Therefore, as a result of the Court's finding of personal jurisdiction over UMS, the judgment of August 3, 1998 is hereby re-instated except as to that portion rendering judgment as to Britamco Underwriters, Inc. The Court will enter a separate judgment accordingly.