**Reversed and Remanded and Majority and Dissenting Opinions filed June 30, 2015.**

In The

# Fourteenth Court of Appeals

## NO. 14-14-00012-CV

**TARA MENON, Appellant**

**V.**

**WATER SPLASH, INC., Appellee**

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 13-CV-0205**

## D I S S E N T I N G   O P I N I O N

The only question that appellant Tara Menon presents for our review is whether service by mail to a defendant in Canada is permitted under Article 10(a) of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("the Service Convention").[1] The majority concludes that it is not.[2] In reaching this result, the majority fails to

---

[1] *Opened for signature* Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163.

[2] *But see Cook v. Toidze*, 950 F. Supp. 2d 386, 394 (D. Conn. 2013) ("[S]ervice by regular mail is proper under the Hague Convention where the party served is a resident of

follow the United States Supreme Court's directions on the construction of treaties and the Texas Supreme Court's instructions on the correct approach to decisions of the federal courts. Because Texas intermediate appellate courts are bound by these authorities, I instead would follow their precepts, which lead to the conclusion that service by mail to a litigant in Canada is permitted under Article 10(a) of the Service Convention. I accordingly would affirm.

## I. ISSUES PRESENTED

It is unnecessary to detail the facts in this case, because although Menon's brief lists four issues, she has presented only a single narrow question of law. That question is presented in her third issue, in which she asks, "Did the drafters of the Hague Service Convention intend for the word 'send' contained in Article 10(a) to mean 'serve'?" She restates the question in her fourth issue, asking, "May a litigant serve a Canadian citizen and resident of Québec with process in a Texas civil proceeding (bypassing traditional diplomatic channels and the Central Authority under the Hague Service Convention) by sending citation directly to the Canadian citizen . . . by mail, private delivery service, or e-mail?"

Menon's first two issues do not raise any other questions. Her briefing of her first stated issue ("Did the trial court err in denying the motion for new trial and refusing to set aside the default judgment?") contains no argument, but instead

---

Canada."); *Mitchell v. Theriault*, 516 F. Supp. 2d 450, 455 (M.D. Pa. 2007) (holding that service of process by mail on a resident of Québec is not prohibited by the Service Convention); *Heredia v. Transp. S.A.S., Inc.*, 101 F. Supp. 2d 158, 161 (S.D.N.Y. 2000) ("[S]ervice by registered mail in Quebec is adequate service under the Convention."); *Randolph v. Hendry*, 50 F. Supp. 2d 572, 578 (S.D. W. Va. 1999) ("Because Canada does not object to service by postal channels, service of process by mail is authorized in this case."); *Taft v. Moreau*, 177 F.R.D. 201, 204 (D. Vt. 1997) ("Plaintiffs' use of registered mail, return receipt requested, to transmit the summons and complaint [to defendants in Québec] was in compliance with the Hague Convention."); *Cantara v. Peeler*, 701 N.Y.S.2d 556, 557 (App. Div. 1999) (holding that Article 10(a) permits service by mail upon residents of Canada because Canada has not objected to service through postal channels).

2

consists solely of an introduction and a single statement, with citations, regarding the standard of review.[3]  In her second issue, she asks, "Can state law provide a procedure for service of process in foreign nations that does not comport with traditional international law (e.g. letters rogatory) or the Hague Service Convention?"  As stated, this issue begs the question of whether service by mail comports with the Service Convention.

Menon has not briefed any other grounds for reversing the trial court's denial of her motion for new trial or setting aside the default judgment.  Moreover, she concedes that "[i]f Article 10(a) authorizes service of process by a litigant mailing or e-mailing documents directly to a party, without going through the Central Authority of the receiving nation, then the service in this case was good." *See* TEX. R. CIV. P. 108a(1)(d) ("Service of process may be effected upon a party in a foreign country if service of the citation and petition is made . . . pursuant to the terms and provisions of any applicable treaty or convention . . . .").  But, before reaching this question, it is first necessary to clarify the standard of review.

## II.  STANDARD OF REVIEW

We review the trial court's ruling on a motion for new trial for abuse of discretion, but "abuse of discretion" means different things in different contexts. *See Schuring v. Fosters Mill Vill. Cmty. Ass'n*, 396 S.W.3d 73, 76 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).  Here, the relevant facts are undisputed, and Menon moved for a new trial on the ground that Article 10(a) of the Service Convention does not permit service by mail.  We accordingly are presented only with a question of law, not with a matter within the trial court's discretion. *See*

---

[3] *See* TEX. R. APP. P. 38.1(i); *Archer v. DDK Holdings LLC*, No. 14-14-00017-CV, 2015 WL 1393299, at *4 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (where appellants stated an issue challenging the judgment and the trial court's findings on two grounds, but only briefed one ground, they waived appellate review of the unbriefed ground).

3

*Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts."). Courts review questions of law de novo. *Pinnacle Premier Props., Inc. v. Breton*, 447 S.W.3d 558, 563 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (sub. op.).

## III. GOVERNING LAW

In this country, there are at least two competing lines of authority interpreting Article 10(a) of the Service Convention. The prevailing view holds that Article 10(a) permits service by mail. *See, e.g.*, *Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004); *Research Sys. Corp. v. IPSOS Publicité*, 276 F.3d 914 (7th Cir. 2002); *Koehler v. Dodwell*, 152 F.3d 304 (4th Cir. 1998); *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986). The countervailing view holds that Article 10(a) does not permit service by mail. *See, e.g.*, *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002); *Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8th Cir. 1989). This provision had not been construed previously by the United States Supreme Court, the Texas Supreme Court, or this court. In the absence of binding precedent for us to follow, this case presented our court with the opportunity to choose the better-reasoned approach. *See Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993) (per curiam) (explaining that Texas courts "are *obligated* to follow only higher Texas courts and the United States Supreme Court").

Fortunately, however, our existing tools are equal to the task of breaking new ground. Although there is no binding precedent that answers the specific question before us, there is binding precedent that tells us how to find that answer for ourselves. I accordingly would look first to the United States Supreme Court to identify the principles that both state and federal courts are required to apply in

4

construing treaties. Next, I would follow the same steps used by our nation's highest court in applying those principles. *See Life Partners, Inc. v. Arnold*, Nos. 14-0122 & 14-0226, 2015 WL 2148767, at *7 (Tex. May 8, 2015) ("We have described the Supreme Court's decisions in some detail here, however, because in addition to providing the relevant test, they also describe the proper *approach* to the term's construction.").

## A. Principles of Treaty Construction

In construing Article 10(a) of the Service Convention, this court is bound by the following principles.

1. **A treaty is not legislation.** *See Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232–33, (2014) ("'A treaty is in its nature a contract between . . . nations, not a legislative act.'" (quoting *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829))); *id.* at 1233 ("[I]n their nature treaties originate differently from laws. They are made by equal parties, and each side has half of the bargain to make . . . ." (quoting 2 Debates on the Federal Constitution 506 (J. Elliot 2d ed. 1863) (James Wilson))).

2. **A treaty is not construed in the same way as legislation.** *See id.* at 1233 ("That distinction [between a legislative act and a contract] has been reflected in the way we interpret treaties."); *Nielsen v. Johnson*, 279 U.S. 47, 51 (1929) ("The narrow and restricted interpretation of the treaty . . . , while permissible and often necessary in construing two statutes of the same legislative body in order to give effect to both so far as is reasonably possible, is not consonant with the principles which are controlling in the interpretation of treaties.").

3. **A treaty instead is construed in the manner of a contract.** *See Lozano*, 134 S. Ct. at 1232–33; *see also BG Grp., PLC v. Republic of Argentina*,

134 S. Ct. 1198, 1208 (2014) ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent."); *Santovincenzo v. Egan*, 284 U.S. 30, 40 & n.2 (1931) ("[T]reaties are contracts between independent nations . . . .").

4. **A treaty, however, is construed more liberally than a private contract.** *See Choctaw Nation of Indians v. United States*, 318 U.S. 423, 431 (1943) ("[T]reaties are construed more liberally than private agreements . . . ."); *see also Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 10 (1936) ("[T]reaties should be liberally construed so as to give effect to the apparent intention of the parties."); *Factor v. Laubenheimer*, 290 U.S. 276, 293–94 (1933) (explaining that "[c]onsiderations which should govern the diplomatic relations between nations, and the good faith of treaties" require that "if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred"); *Todok v. Union State Bank of Harvard, Neb.*, 281 U.S. 449, 454 (1930) (explaining that it is a "fundamental principle that treaties should receive a liberal interpretation to give effect to their apparent purpose").

5. **Such a liberal construction is required to secure equality and reciprocity between the signatories.** *See Factor*, 290 U.S. at 293 (explaining that treaties are "liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them"); *Jordan v. K. Tashiro*, 278 U.S. 123, 127 (1928) (same); *see also Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 80 (Tex. 2000) ("As treaties are to be construed broadly, the treaty need not provide explicitly for equal court access; it need only imply it." (citing *Asakura v. City of Seattle*, 265 U.S. 332, 342 (1924)).

## B. Steps in Applying the Principles of Treaty Construction

As the foregoing principles show, we are required to construe a treaty more liberally than a private contract to implement the apparent intention of the parties to secure equality and reciprocity between them. And although the construction of a treaty begins with its text, we are not permitted to end the inquiry there. *See, e.g., Abbott v. Abbott*, 560 U.S. 1, 9–10 (2010) ("This Court's inquiry is shaped by the text of the Convention; the views of the United States Department of State; decisions addressing the meaning of 'rights of custody' in courts of other contracting states; and the purposes of the Convention."); *Choctaw Nation*, 318 U.S. at 431–32 ("[T]o ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." (citing *Factor*, 290 U.S. at 294, 295)).

As a practical matter, then, how do we apply the principles that govern treaty construction? To answer this question, I would again look to the precepts set forth by the United States Supreme Court. *See Life Partners, Inc.*, 2015 WL 2148767, at *7.

### 1. Identify the Treaty's Purpose.

The text must be read "with a view to making effective the purposes of the high contracting parties." *Sullivan v. Kidd*, 254 U.S. 433, 439 (1921); *see also El Al Isr. Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999) (identifying a treaty's "cardinal purpose"). The treaty's purpose may be expressly stated in its preamble, *see Tseng*, 525 U.S. at 169, and the role played by a specific provision may be gleaned from the treaty's structure and the context in which the provision appears. *See Olympic Airways v. Husain*, 540 U.S. 644, 650 (2004) (noting that the Court considers the treaty's "text, structure, and history"); *Tseng*, 525 U.S. at 169 (identifying the treaty interpretation that "is most faithful to the Convention's

text, purpose, and overall structure"); *Santovincenzo*, 284 U.S. at 37 (considering "the context of the provision in question").

## 2. Identify the signatories' shared expectations.

The treaty must be read "in a manner 'consistent with the shared expectations of the contracting parties.'" *Lozano*, 134 S. Ct. at 1233 (quoting *Husain*, 540 U.S. at 650); *Tseng*, 525 U.S. at 167 (same); *Air France v. Saks*, 470 U.S. 392, 399 (1985) ("[I]t is our responsibility to give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties."); *see also Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 223–25 (1996) (rejecting the petitioners' interpretation of a phrase as "implausible" and "unlikely" in view of "the shared expectations of the contracting parties," and instead concluding that "an equally plausible reading . . . that leads to a more comprehensible result" was the only "realistic" alternative). Adherence to the parties' shared expectations is required because—unlike legislation—a treaty is "necessarily the product of consensus." Michael P. Van Alstine, *The Death of Good Faith in Treaty Jurisprudence and a Call for Resurrection*, 93 GEO. L.J. 1885, 1923 (2005). "Contrary to the majoritarian premise of statutory adoption, there is no means of imposing treaty obligations on a dissenting minority. If the product of negotiations is not satisfactory, a disaffected nation may simply not ratify the treaty." *Id.*

It therefore is no surprise that to identify those shared expectations, courts must consider the treaty's negotiating and drafting history. *See, e.g., Medellín v. Texas*, 552 U.S. 491, 507 (2008); *Tseng*, 525 U.S. at 167; *Zicherman*, 516 U.S. at 226; *Choctaw Nation*, 318 U.S. at 431–32; *Factor*, 290 U.S. at 294–95; *Nielsen*, 279 U.S. at 52. The construction of the Service Convention is no exception to this rule. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988)

(examining the Service Convention's drafting history and negotiations).

To understand a treaty's negotiating and drafting history, its provisions must be considered in the language used by the drafters in the official text. *See Zicherman*, 516 U.S. at 221 (considering the meaning of the French word *dommage* where the official text of the treaty was in French, and rejecting the contention "that we simply look to English dictionary definitions of 'damage' and apply that term's 'plain meaning'"); *Saks*, 470 U.S. at 399 ("We look to the French legal meaning for guidance as to [the signatories' shared] expectations because the Warsaw Convention was drafted in French by continental jurists."); *Todok*, 281 U.S. at 454 ("The text of the treaty of 1783 with Sweden was in French only, and the French text is therefore controlling."). Where the official text of the treaty was drawn up in two languages, then courts consider both languages when analyzing the parties' shared expectations. *See United States v. Percheman*, 32 U.S. (7 Pet.) 51, 88–89 (1833) (where a treaty was drawn up in both Spanish and English, the Court considered the text in both languages, explaining that "[n]o violence is done to the language of the treaty by a construction which conforms the English and Spanish to each other").

The Service Convention was drafted "in the English and French languages, both texts being equally authentic." *Schlunk*, 486 U.S. at 699; *see also* Service Convention, *supra* note 1, at closing paragraph (stating that the Service Convention was drafted "in the English and French languages, both texts being equally authentic, in a single copy"). Thus, the negotiating and drafting history of the Service Convention's text in both languages must be considered. *See Schlunk*, 486 U.S. at 700–01 (considering French terms that were proposed for inclusion in the Service Convention and comparing the meanings given to the terms "in some countries, such as France" and "in others, such as the United States"). This

9

negotiating and drafting history may be documented by the conference's rapporteur.  *See United States v. Louisiana*, 394 U.S. 11, 43 (1969).

In addition to considering the text itself, courts consider the way in which the text was interpreted by the delegates involved in negotiating and drafting the treaty.  *See Schlunk*, 486 U.S. at 703 (considering statements and articles by Philip Amram, the head of the United States delegation to the Convention); *id.* at 709–10 & n.1, 714, 716 (Brennan, J., concurring) (same).  The delegates' views also may be memorialized by the conference rapporteur.  *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 530 n.13 (1987).

### 3.    Accord "great weight" to the Executive Branch's interpretation.

"It is well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.'"  *Abbott*, 560 U.S. at 15 (quoting *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982)); *Medellín*, 552 U.S. at 513 (same); *Tseng*, 525 U.S. at 168 ("Respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty.").

### 4.    Accord "considerable weight" to the interpretation of the other signatories.

Finally, the parties' shared expectations are shown by their post-ratification understanding and conduct.  *See Medellín*, 552 U.S. at 507; *Husain*, 540 U.S. at 649–50; *Tseng*, 525 U.S. at 167; *Zicherman*, 516 U.S. at 227; *see also O'Connor v. United States*, 479 U.S. 27, 33 (1986) ("The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning.").  These may be documented in an organizational handbook or report.  *See Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 182 n.40 (1993) (quoting Office of United Nations High Commissioner for Refugees,

Handbook on Procedures and Criteria for Determining Refugee Status 46 (Geneva, Sept. 1979)). The United States Supreme Court instructs us that, when interpreting a treaty, "'[t]he opinions of our sister signatories . . . are entitled to considerable weight.'" *Abbott*, 560 U.S. at 16 (*Tseng*, 525 U.S. at 176); *Saks*, 470 U.S. at 404 (same).

### 5. Consider the analysis of scholars.

*See Abbott*, 560 U.S. at 18 ("Scholars agree that there is an emerging international consensus on the matter.").

## IV. APPLICATION

Having identified the governing precepts in the construction of treaties and the way in which they are applied, I would pursue the same approach in this case.

### A. The Service Convention's Purpose

The Service Convention's two purposes are stated in its preamble:

> The States signatory to the present Convention,
>
> Desiring to create appropriate means to ensure that judicial and extrajudicial documents *to be served abroad* shall be brought to the notice of the addressee in sufficient time,
>
> Desiring to improve the organisation of mutual judicial assistance *for that purpose* by simplifying and expediting the procedure,
>
> Have resolved to conclude a Convention to this effect and have agreed upon the following provisions

Service Convention, *supra* note 1, at preamble (emphasis added); *see also Schlunk*, 486 U.S. at 702–04 (looking to the Service Convention's preamble for the identification of its purpose). Consistent with those purposes, the Service Convention's scope is set forth in Article 1: "The present Convention shall apply in all cases, in civil or commercial matters, where there is occasion to transmit a

11

judicial or extrajudicial document *for service abroad*." Service Convention, *supra* note 1, at Art. 1 (emphasis added).

This is a more specific purpose than that found by the majority in this case. By agreeing with Menon's argument that "she was not served pursuant to the Hague Convention service of process provisions,"[4] the majority necessarily has concluded that there are *non-service* provisions in the Service Convention. But the United States Supreme Court has examined the English and French text of the Service Convention and its drafting history and concluded that the opposite is true: the Court explained that Article 1 "eliminate[d] the possibility" that the Service Convention could apply to transmissions abroad "that do not culminate in service":

> The preliminary draft of Article 1 said that the present Convention shall apply in all cases in which there are grounds *to transmit or to give formal notice of* a judicial or extrajudicial document in a civil or commercial matter to a person staying abroad. [3 1964 Conférence de la Haye de Droit International Privé, Actes et Documents de la Dixième Session (Notification) 65 (1965) (3 Actes et Documents)] ("La présente Convention est applicable dans tous les cas où il y a lieu *de transmettre ou de notifier* un acte judiciaire ou extrajudiciaire en matière civile ou commerciale à une personne se trouvant à l'étranger") (emphasis added). To be more precise, the delegates decided to add a form of the juridical term "signification" (service), which has a narrower meaning than "notification" in some countries, such as France, and the identical meaning in others, such as the United States. *Id.*, at 152–153, 155, 159, 366. The delegates also criticized the language of the preliminary draft because it suggested that the Convention could apply to transmissions abroad that do not culminate in service. *Id*., at 165–167. The final text of Article 1, *supra,* eliminates this possibility and applies only to documents transmitted for service abroad. The final report (*Rapport Explicatif* ) confirms that the Convention does not use more general terms, such as delivery or transmission, to define its scope because it applies only when there is both transmission of a document from the requesting state to the

---

[4] *Ante*, at ___.

12

<u>receiving state, and service upon the person for whom it is intended</u>. *Id.*, at 366.

*Schlunk*, 486 U.S. at 700–01 (emphasis added).

In accordance with the United States Supreme Court's analysis, I would conclude that the Service Convention addresses only the transmission of documents that culminate in service, and thus, the reference in Article 10(a) to "send[ing] judicial documents" means "serv[ing] judicial documents." Service Convention, *supra* note 1, at Art. 10(a).

**B.      The Shared Expectations of the Signatories to the Service Convention**

To ascertain the parties' shared expectations, I would consider the actual and proposed language of Service Convention's bilingual text, its negotiating and drafting history, and the understanding of the delegates.

**1.      Negotiating and Drafting History of the Text**

In addition to the text and the negotiating and drafting history previously described, I would give considerable weight to the fact that "[t]he French text of the 1965 convention was copied from three earlier Hague Conference conventions, all of which were understood to allow service upon defendants abroad by mail." *See* Michael O. Eshleman & Stephen A. Wolaver, *Using the Mail to Avoid the Hague Service Convention's Central Authorities*, 12 OR. REV. INT'L L. 283, 333 (2010).

I additionally would consider the following history:

The Rapporteur's report on article 10(a) of the draft convention provides in part: "The provision of paragraph 1 [labelled '(a)' in the final text] also permits service by telegram if the state where service is to be made does not object. The Commission did not accept the

13

proposal that postal channels be limited to registered mail."[5]

If Article 10(a) was considered to include service by telegram, and not to be "limited to registered mail," then it cannot be said, as the majority now holds, that this provision does not permit service by mail.

## 2.    The Understanding of the Delegates

I next would consider the statements of Philip W. Amram, a member of the United States delegation to the Hague Conference that drafted the Service Convention.  Indeed, in his concurring opinion in *Schlunk*, Justice Brennan identified Amram as "[t]he head of the delegation" and its "chief negotiator." *Schlunk*, 48 U.S. at 710, 714 (Brennan, J., concurring).  Amram also was the only English-speaking member of the Service Convention's drafting committee.  *See* Eshleman & Wolaver, *supra*, at 325 (citing Unification of the Rules of Private International Law: Report of the U.S. Delegation to the 10th Session of the Hague Conference on Private International Law, October 7–28, 1964, 52 Dep't State Bull. 265, 265–66 (1965)).  Amram "told the Senate Foreign Relations Committee that 'unless the requested State objects, direct service by mail' was allowed under Article 10 and 'use of the central authority is not obligatory.'"  *Id.* at 325–26 (footnotes omitted).

Because the United States Supreme Court cited Amram's statement to the Senate in the Court's only opinion construing the Service Convention, *see Schlunk*, 486 U.S. at 703, I would consider this statement in ascertaining the signatories' shared expectations.  *See also* Philip W. Amram, *The Proposed International*

---

[5] Patricia N. McCausland, Note and Comment, *How May I Serve You? Service of Process by Mail Under the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters*, 12 PACE L. REV. 177, 186 n.67 (1992) (translated from 3 Actes et Documents de la Dixième Session (Conférence de la Haye de Droit International Privé) 90 (1964)).

14

*Convention on the Service of Documents Abroad*, 51 A.B.A. J. 650, 653 (1965) ("Article 10 permits direct service by mail . . . unless [the receiving] state objects to such service.").

## C. The Executive Branch's Interpretation of Article 10(a)

The Executive Branch has unwaveringly maintained that Article 10(a) permits service by mail. "Dean Rusk, the American secretary of state at the time the convention was negotiated, signed, and ratified, stated in his official report to President Johnson: 'Article 10 permits direct service by mail . . . unless [the receiving] state objects to such service.'" Eshleman & Wolaver, *supra*, at 325. The State Department subsequently produced a circular stating that unless a nation "'has made a specific reservation . . . objecting to service by registered mail . . . [service] may be made by international registered mail.'" *Id.* (citing U.S. Dep't of State, Bureau of Consular Affairs, Overseas Citizen Services, Office of Citizen Consular Services, Service of Legal Documents Abroad, *excerpted in* Judicial Assistance: Service: International Registered Mail, [2] 1981–1988 Digest § 6, at 1441–45). And, when the first federal appellate court held to the contrary, "the State Department formally said the . . . ruling was wrong . . . [in suggesting] that the Hague Convention does not permit as a method of service the sending of a copy of the summons and complaint by registered mail to a defendant in a foreign country.'" *Id.* at 326 (citing Letter from Alan J. Kreczco, Legal Adviser, U.S. Dep't of State, to the Administrative Office of the U.S. Courts and the National Center for State Courts (Mar. 14, 1991), *excerpted in United States Department of State Opinion Regarding the* Bankston *Case and Service by Mail to Japan Under Hague Service Convention*, 30 I.L.M. 260, 261 (1991)).[6]

---

[6] Kreczco's name actually is spelled "Kreczko"; his title was Deputy Legal Adviser; and the referenced letter was dated Mar. 14, 1990.

Regarding the specific application of Article 10(a) in this case, the State Department's website shows its view that Canada accepts "service of process by mail."[7]

In accordance with the instructions from the United States Supreme Court, I would give such views "great weight."

## D. The Interpretation of Article 10(a) by Other Signatories

The post-ratification understanding of the parties can be seen in a Hague Conference report on the signatories' response to the following question:

> Question D: Have there been any court decisions in your country interpreting Article 10(a) of the Hague Service Convention which reads as follows:
>
> "Provided the State of destination does not object, the present Convention shall not interfere with –
>
> (a) the freedom to send judicial documents by postal channels directly to persons abroad . . ."
>
> [Answer]   It was pointed out that the postal channel for service constitutes a method which is quite separate from service via the Central Authorities or between judicial officers.  Article 10(a) in effect offered a reservation to Contracting States to consider that service by mail was an infringement of their sovereignty.  Thus, theoretical doubts about the legal nature of the procedure were unjustified.  Nonetheless, certain courts in the United States of America in opinions cited in the "Checklist" had concluded that service of process abroad by mail was not permitted under the Convention.[8]

---

[7] U.S. Dep't of State, Bureau of Consular Affairs, *Legal Considerations: International Judicial Assistance: Country Information: Canada*, TRAVEL.STATE.GOV, http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/canada.html (last visited June 26, 2015) (parentheses added).

[8] PERMANENT BUREAU, HAGUE CONFERENCE ON PRIVATE INT'L LAW, REPORT ON THE WORK OF THE SPECIAL COMMISSION OF APRIL 1989 ON THE OPERATION OF THE HAGUE

The significance of this unanimity in the interpretation of a convention that has now existed for fifty years and has been signed or ratified by sixty-eight countries cannot be overstated, because as our highest court has explained, the judiciary's "role is limited to giving effect to the intent of the Treaty parties. When the parties to a treaty . . . agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Avagliano*, 457 U.S. at 184–85.

Despite a diligent search, I have found no authority that our fellow signatories have interpreted Article 10(a) to pertain only to the "sending" of documents and not to the "service" of documents. Because the required "extraordinarily strong contrary evidence" is lacking, I accordingly would defer to the signatories' interpretation that Article 10(a) permits service by mail. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 259 (1984) ("We may not ignore the actual, reasonably harmonious practice adopted by the United States and other signatories in the first 40 years of the Convention's existence." (referring to the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), reprinted in Note following 49 U.S.C. § 1502)); *see also In re Morgan Stanley & Co.*, 293 S.W.3d 182, 189–90 (Tex. 2009) (orig. proceeding) (rejecting the Fifth Circuit's interpretation on a question of law "[g]iven the overwhelming weight of authority" reaching a contrary result).

---

CONVENTIONS OF 15 NOVEMBER 1965 ON THE SERVICE ABROAD OF JUDICIAL AND EXTRAJUDICIAL DOCUMENTS IN CIVIL OR COMMERCIAL MATTERS AND OF 18 MARCH 1970 ON THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS 4–5 (Apr. 1989), *available at* http://www.hcch.net/upload/scrpt89e_20.pdf (italics omitted).

**E.    The Interpretation of Article 10(a) by Leading Scholars**

I also would follow the example of the United States Supreme Court in consulting the writings of Bruno Ristau as to the intentions of the Service Convention's drafters. *See Schlunk*, 486 U.S. at 698, 700, 703 (citing 1 B. Ristau, International Judicial Assistance (Civil and Commercial) (1984 and 1 Supp. 1986)). Like all of our sister signatories and our own government, Ristau states that Article 10(a) permits service by mail:

> Ristau has written that the language of Article 10(a) regarding the use of "postal channels" was "intended to include service of process." Others concur. "It is clear that . . . every participant in the debates concerning Article 10(a) . . . understood the provision as referring to . . . the use of postal channels for the purpose of service." Another analysis said "[p]erhaps the most compelling evidence in support of the theory that Article 10(a) authorizes service by mail is the fact that those who actually participated in the original Convention . . . believe that to be the case."
>
> Ristau quoted the official report on the draft convention, which indicated the language of Article 10 was worded broadly. It is so broad, he writes, that it "permits service by telegram if the State where service is to be made does not object."

Eshleman & Wolaver, *supra*, at 331–32 (footnotes omitted).

Based on all of the foregoing, I would conclude that Article 10(a) of the Service Convention permits service by mail.

## V.  THE COUNTERVAILING VIEW

The majority concludes that "the better-reasoned approach" is to follow the countervailing view espoused by the Fifth Circuit in *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374 (5th Cir. 2002). The majority, however, has not explained why an approach that eschews the principles of treaty construction laid down by the United States Supreme Court is "better-reasoned," or even how

those following the prevailing view have arrived at a different result.

The majority's opinion constitutes binding precedent on this court until it is overruled by a higher court or by our own court, whether in response to a motion for rehearing or for rehearing en banc or in a different case. And because it is binding, I believe it is important for the analysis to be transparent. This is especially so in this case, given that the majority adopts an interpretation contrary to that of the American delegation, the American government, most American courts, and those of our sister signatories—including, as the majority admits, Canada.[9] I accordingly have applied the governing precepts to illustrate how they necessarily lead to the conclusion that Article 10(a) of the Service Convention permits service by mail. Respectfully, I believe that the majority's differing analysis, like the analyses in the cases on which it relies, is flawed.

## A.  The Majority's Adoption of the Reasoning of *Nuovo Pignone*

As previously explained, the first precept of treaty construction is that a treaty is not construed as legislation, but instead is construed more liberally than a private contract, drawing on a wide variety of sources in order to implement the signatories' shared expectations. In *Nuovo Pignone*, however, the Fifth Circuit did the opposite. As the court stated it,

> We adopt the reasoning of courts that have decided that the

---

[9] *Ante*, at ___, n.1; *see also* Hague Conference on Private Int'l Law, List of Central Authorities Designated by Canada, HCCH, 6, http://www.hcch.net/upload/auth14ca2014en.pdf (list up-to-date as of August 2014) (identifying the Ministère de la Justice as the Central Authority for Québec and identifying that office's website). On that website, Québec's Central Authority states, "The Convention also sets out other methods of transmitting documents that do not require processing through a Central Authority [including] postal service . . . . Under the Convention, a State may object to those methods although Canada did not declare any opposition when it ratified the Convention." Gouvernement du Québec, *Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters: Other Methods of Transmission*, JUSTICE QUÉBEC, http://www.justice.gouv.qc.ca/english/programmes/sneaje/transmission-a.htm (last updated Feb. 26, 2004).

Hague Convention does not permit service by mail. In doing so, we rely on the canons of statutory interpretation rather than the fickle *presumption* that the drafters' use of the word "send" was a mere oversight. "Absent a clearly expressed legislative intention to the contrary," a statute's language "must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S. Ct. 2051, 64 L. Ed. 2d 766 (1980). And because the drafters purposely elected to use forms of the word "service" throughout the Hague Convention, while confining use of the word "send" to article 10(a), we will not *presume* that the drafters intended to give the same meaning to "send" that they intended to give to "service."

*Id*. at 384 (emphasis added). Thus, the Fifth Circuit essentially compared two words—in English only—and treated the distinction between the two as conclusive. *But see* Eshleman & Wolaver, *supra*, at 333–34 (discussing use of the same language in the Conventions of 1954, 1905, and 1896, all of which used the French word translated as "send" in referring to service of process by mail).

This approach follows none of the governing precepts of treaty construction. The majority in this case, like the authors of the cases on which the majority relies, instead have followed a canon of statutory interpretation, despite the United States Supreme Court's contrary directive in a case decided just last year. *See Lozano*, 134 S. Ct. at 1232–33 ("The Hague Convention . . . is a treaty, not a federal statute. . . . 'A treaty is in its nature a contract between . . . nations, not a legislative act.' . . . That distinction has been reflected in the way we interpret treaties. It is our 'responsibility to read the treaty in a manner consistent with the *shared* expectations of the contracting parties.") (citations and internal quotations omitted, emphasis in original). The majority in this case neither treats the United States Supreme Court's discussion of how a Hague Convention is to be construed as binding precedent, nor explains its reasons for failing to do so. The majority instead follows *Nuovo Pignone*, in which the Fifth Circuit approached the question

20

of treaty construction as though the only alternative to the application of "canons of statutory construction" was a "fickle presumption that the drafters' use of the word "send" was a mere oversight." *Nuovo Pignone*, 310 F.3d at 384. But, the drafters' intent is well-established without the need for a presumption. As previously explained, there is no dispute among the signatories that Article 10(a) permits service by mail. Like the majority in this case, the *Nuovo Pignone* court did not even mention most of the precepts that govern treaty construction, or the fact that the Service Convention's predecessors dating back more than a hundred years used the word "send" even when referring to service of process by mail.

As reasons for rejecting the interpretation of Article 10(a) that is followed by all of the other Service Convention's signatories, the United States government, and a majority of courts in this country, the Fifth Circuit stated as follows:

> Nuovo Pignone's contention that the broad purpose of the Hague Convention is furthered if article 10(a) is interpreted to allow service by mail is problematic. As noted, the purpose of the Hague Convention is not only to simplify the service of process, but to ensure that plaintiffs deliver notice to foreign addressees in sufficient time to defend the allegation. Indeed, FED. R. CIV. P. 4(f)(1) presumes that the Hague Convention provides methods of service "reasonably calculated to give notice."
>
> We are not confident, nor should the drafters have been confident in 1967 [sic],[10] that mail service in the more than forty signatories [sic][11] is sufficient to ensure this goal. [In an

---

[10] The Convention was not drafted in 1967; it was drafted in 1964. *See Schlunk*, 486 U.S. at 698 ("The Hague Service Convention is a multilateral treaty that was formulated in 1964 by the Tenth Session of the Hague Conference of Private International Law.").

[11] There were twenty-three member States when the Service Convention was drafted. *See Schlunk*, 486 U.S. at 698 ("Representatives of all 23 countries that were members of the Conference approved the Convention without reservation."); Kurt H. Nadelmann & Willis L. M. Reese, *The Tenth Session of the Hague Conference on Private International Law*, 13 AM. J. COMP. L. 612, 612 n.1 (1964) (listing the twenty-three member States when the Service Convention was drafted).

21

accompanying footnote, the court added, "Indeed, the advisory committee notes to the 1963 amendments to FED. R. CIV. P. 4 recognize that '[s]ervice of process beyond the territorial limits of the United States may involve difficulties not encountered in the case of domestic service.'"] Under Nuovo Pignone's interpretation of article 10(a), the fact that a signatory could object to service by mail is unconvincing. There is no reason to think that signatories with inadequate mail services would voluntarily opt out of article 10(a).

Finally, we note that other provisions of the Hague Convention describe more reliable methods of effecting service. Service of process through a central authority under articles 2 through 7 and service through diplomatic channels under articles 8 and 9 require that service be effected through official government channels. It is unlikely that the drafters would have put in place these methods of service requiring the direct participation of government officials, while simultaneously permitting the uncertainties of service by mail.

*Id.* at 384–85 & n.17. For several reasons, the stated rationale cannot withstand scrutiny.

First, the Fifth Circuit implies that in the Federal Rules of Civil Procedure in effect when the Service Convention was drafted, the advisory committee anticipated that service abroad *by mail* involved difficulties not present in domestic service. To the contrary, however, the advisory committee's only example of difficulties in service abroad was that "a person not qualified to serve process according to the law of the foreign country may find himself subject to sanctions if he attempts service therein."[12] The 1963 amendment to Federal Rule of Civil Procedure 4(i) was intended to ameliorate such difficulties by providing for five "alternative provisions for service in a foreign country"—including service by mail. *See Amendments to Rules of Civil Procedure for the U.S. Dist. Courts*, 31

---

[12] *See* ADVISORY COMM. ON CIVIL RULES, STATEMENT ON BEHALF OF THE ADVISORY COMMITTEE ON CIVIL RULES, PROPOSED AMENDMENTS TO THE RULES OF CIVIL PROCEDURE FOR THE UNITED STATES DISTRICT COURTS 11 (July 18, 1962), *available at* http://www.uscourts.gov/rules-policies/archives/committee-reports/advisory-committee-rules-civil-procedure-july-1962.

F.R.D. 587, 595 (1963). That provision, "permitting service by certain types of mail, affords a manner of service that is inexpensive and expeditious, and requires a minimum of activity within the foreign country."[13] The Fifth Circuit cites neither evidence nor authority for its contrary assumption.

Second, the court's statement that "[t]here is no reason to think that signatories with inadequate mail services would voluntarily opt out of article 10(a)" is contrary to the statutory textual analysis that the authoring court purports to apply. Specifically, Article 21 of the Service Convention *requires* that "[e]ach Contracting State shall similarly inform the Ministry, where appropriate, of . . . opposition to the use of methods of transmission pursuant to Articles 8 and 10." Service Convention, *supra* note 1, at Art. 21; *see also United States v. Caldera-Herrera*, 930 F.2d 409, 411 (5th Cir. 1991) ("Where possible, statutes must be read in harmony with one another so as to give meaning to each provision." (citing *Fed. Aviation Admin. v. Robertson*, 422 U.S. 255, 261 (1975))). Not only must we presume that signatories that voluntarily chose to sign the agreement intended to comply with Article 21, but such compliance is objectively verifiable by the signatories' post-ratification conduct: approximately half of the Service Convention's signatories have either qualified their acceptance of Article 10 or have opposed it entirely.[14]

Third, the Fifth Circuit makes the unsupported assumption that the drafters would not have permitted service by mail when two "more reliable" methods of service (through a Central Authority and through diplomatic channels) were available. In doing so, the court assumes not only that mail is less reliable, but also

---

[13] ADVISORY COMM. ON CIVIL RULES, *supra* note 12, at 12.

[14] *See* Hague Conference on Private Int'l Law, *Table Reflecting Applicability of Articles 8(2), 10(a),(b), and (c), 15(2) and 16(3) of the Hague Service Convention*, HCCH (Feb. 2013), http://www.hcch.net/upload/applicability14e.pdf.

that the drafters would not have included both a more reliable and a less reliable method. If this were true, however, then the drafters would have included only the single most reliable method of service, whether that was service through a Central Authority or service through diplomatic channels, but not both. *But see* Philip W. Amram, *Report on the Tenth Session of the Hague Conference on Private International Law*, 59 AM. J. INT'L L. 87, 90 (1965) ("Use of the Central Authority is purely optional with the applicant for service."). And if mail is presumed unreliable, then how are the service documents to be transmitted to a foreign Central Authority *without* the use of mail? *See* Service Convention, *supra* note 1, at Art. 2 ("Each Contracting State shall designate a Central Authority which will undertake to *receive requests for service coming from other Contracting States . . . .*) (emphasis added); *id*. at Art. 3 ("The authority or judicial officer competent under the law of the State in which the documents originate *shall forward to the Central Authority* of the State addressed a request conforming to the model annexed to the present Convention . . . .") (emphasis added). And how, without using mail, is the foreign Central Authority to communicate directly with the applicant as required? *See id.* at Art. 4 ("If the Central Authority considers that the request does not comply with the provisions of the present Convention *it shall promptly inform the applicant* and specify its objections to the request.") (emphasis added); *id.* at Art. 6 ("The Central Authority of the State addressed . . . shall complete a certificate . . . [stating] that the document has been served . . . [or stating] the reasons which have prevented service. The certificate *shall be forwarded directly to the applicant*.") (emphasis added).

Because the Fifth Circuit in *Nuovo Pignone* did not apply the correct precepts of treaty construction but instead relied on unsupported assumptions, I would decline to follow it. The majority states that "other federal district courts in

Texas . . . have ruled consistently that service must be effectuated by the specific methods authorized by the terms included in the Hague Convention."[15] But, *all* courts agree that if the Hague Service Convention applies, then service must be effectuated by a means permitted under the treaty's terms. As phrased, this statement begs the question of whether service by mail is permitted under Article 10(a). If the majority intended to suggest that federal district courts in the Fifth Circuit have consistently stated that Article 10(a) does not permit service by mail, then that implication is wrong. *See, e.g., Chattem Chems., Inc. v. Akzo Nobel Chems. B.V.*, 229 F. Supp. 2d 555, 556 (M.D. La. 2002) ("The Court, having reviewed conflicting authorities, finds that service made pursuant to Article 10(a) comports with the purpose, meaning and intent of the Hague Convention."); *Brown v. Bandai Am., Inc.*, No. 3-01-CV-0442-R, 2002 WL 1285265, at *4 (N.D. Tex. June 4, 2002) ("[T]he Court determines that service of process by mail is permissible under Article 10(a) of the Hague Convention."); *Lafarge Corp. v. M/V MACEDONIA HELLAS*, No. Civ.A. 99-2648, 2000 WL 687708, at *11 (E.D. La. May 24, 2000) ("[T]his court adopts the reasoning of those courts that conclude that the Hague Convention permits service of process by mail pursuant to Article 10(a)."); *Friede & Goldman, Ltd. v. Gotaverken Arendal Consultants*, No. CIV A 99-1970, 2000 WL 288375, at *3 (E.D. La. Mar. 16, 2000) ("[T]his Court adopts the reasoning of those courts that conclude that the Hague Convention permits service of process by mail pursuant to Article 10(a)."); *Paradigm Entm't, Inc. v. Video Sys. Co.*, No. Civ.A. 3:99-CV-2004P, 2000 WL 251731, at *7 (N.D. Tex. Mar. 3, 2000) ("[T]his Court finds that Article 10(a) provides for service by mail in the current situation."); *Ortega Dominguez v. Pyrgia Shipping Corp.*, No. Civ.A. 98-529, 1998 WL 204798, at *2 (E.D. La. Apr. 24, 1998) ("[T]his Court finds that

---

[15] *Ante*, at ___.

Article 10(a) of the Hague Convention permits service of process by mail."); *Smith v. Dainichi Kinzoku Kogyo Co.*, 680 F. Supp. 847, 851 (W.D. Tex. 1988) ("Plaintiffs' service of process directly upon Dainichi–Japan by registered mail was sufficient to comport with Art. 10(a) of the Hague Convention."); *Great Am. Boat Co. v. Alsthom Atl., Inc.*, Civ. A. Nos. 84-0105 & 84-5442, 1987 WL 4766, at *3 (E.D. La. Apr. 8, 1987) ("Mailing a summons and a copy of the complaint with a return receipt . . . creates personal jurisdiction . . . against a FSIA corporation [i.e, a corporation whose ownership is vested in a foreign state] . . . in a Hague Service Convention state . . . .").

The majority cites several opinions that were issued by federal district courts in Texas after the Fifth Circuit Court of Appeals decided *Nuovo Pignone*, but these decisions add nothing to the discussion. The authoring courts had no choice but to follow *Nuovo Pignone*, because the opinion constitutes binding precedent over the lower courts in the Fifth Circuit. The distinction between a court that is merely following precedent and one that makes an independent determination of an issue can hardly be overemphasized: the Fifth Circuit's trial courts are *required* to treat the Fifth Circuit Court of Appeals' decisions as binding precedent, whereas Texas state courts—including this one—are *forbidden* to treat them as binding precedent. As the Texas Supreme Court has explained:

> The court of appeals' discussion of [a Fifth Circuit case] and its cursory dismissal of contrary federal precedent from other jurisdictions suggests that the court felt bound by the pronouncements of the Fifth Circuit on federal law issues. This is not the case. . . . By focusing so exclusively on [the Fifth Circuit case], the court of appeals overlooks the . . . the weight of . . . federal court decisions from other jurisdictions.

*Penrod Drilling Corp.*, 868 S.W.2d at 296. The majority's failure to discuss the governing precepts of treaty construction or to address the reasoning of courts that

have reached a conclusion contrary to that of the Fifth Circuit suggests that the majority has fallen into the same error here.[16]

## B.    The Majority's Reliance on State Court Decisions

The majority's treatment of state court decisions appears to me to be similarly flawed.  For example, the majority cites *Wuxi Taihu Tractor Co. v. York Group, Inc.*, stating that the authoring court "held that article 5 of the Hague Convention does not permit service by direct mail to a defendant in China who should have been served through the Central Authority pursuant to the specific language of the Hague Convention."[17]  If that were the court's holding, then the case would be merely inapposite, because only Article 10(a) is at issue in this case.  But that was not the court's holding, as can be seen from the fact that the *Wuxi Taihu* court *affirmed* the post-answer default against the foreign defendant.  No.

---

[16] This is not the only problem with the majority's discussion of federal district court decisions.  The only case that it cites for the proposition that the Service Convention does not permit service by mail is *Duarte v. Michelin North America, Inc.*, No. 2:13−CV−00050, 2013 WL 2289942 (S.D. Tex. May 23, 2013).  The majority cites the remaining cases only in connection with articles of the Service Convention that are not at issue here.  And although *Duarte* does indeed cite *Berezowsky v. Ojeda*, No. 4:12-CV-03496, 2013 WL 150714 (S.D. Tex. Jan. 14, 2013) that opinion has since been vacated.  765 F.3d 456 (5th Cir. 2014).

The majority cites *L.K. v. Mazda Motor Corp.*, No. 3:09-cv-469-M, 2009 WL 1033334, at *2 (N.D. Tex. Apr. 15, 2009) with the parenthetical, "holding service under article 5 was not effective because Japanese requirement that service be transmitted to the Central Authority was not met."  That is not the case's holding.  To the contrary, the authoring court did not analyze the adequacy of service at all, but said only that "Plaintiffs' counsel admits that he failed to comply with the requirements of the Hague Convention,"

Finally, the majority cites *Albo v. Suzuki Motor Corp.*, No. 3:08-0139-KC, 2008 WL 2783508 (W.D. Tex. July 2, 2008) with the parenthetical, "holding service not effective because, under article 5, the Hague [Service Convention] required full translation of documents into Japanese and without complying with specific Hague [Service Convention] requirements, service was insufficient."  But as the authoring court explains, the Service Convention itself has no such requirement; it simply provides that "'the Central Authority *may* require [the] document be written in, or translated into, the official language or one of the official languages of the State.'" *Id.* at *2 n.2 (quoting Service Convention, *supra* note 1, at Art. 5) (emphasis added).

[17] *Ante*, at ___.

27

01-13-00016-CV, 2014 WL 6792019, at \*1 (Tex. App.—Houston [1st Dist.] Dec. 2, 2014, pet. pending) (mem. op.). In describing this as the court's holding, the majority fails to follow the standard for distinguishing between dicta and an alternative holding. *See State Farm Mut. Auto. Ins. Co. v. Lopez*, 156 S.W.3d 550, 554 (Tex. 2004) (op. on reh'g) (granting petitioner's motion for rehearing because "we failed to apply the standard for distinguishing between alternative holdings and dicta"); *Tex. Natural Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001) (explaining that a court's statement is not dicta but instead is an alternative holding if "the court could have relied on either determination to reach its ultimate conclusion"). Moreover, the construction of Article 10(a)—the only issue presented for our review—is never mentioned in *Wuxi Taihu*. Indeed, the issue could not have arisen on the facts in that case, because the defective-service complaint in *Wuxi Taihu* concerned service in the People's Republic of China,[18] which—in accordance with Article 21 of the Service Convention—has formally declared its opposition to "the service of documents in the territory of the People's Republic of China by the methods provided by Article 10 of the Convention."[19] But what the *Wuxi Taihu* court actually held was that, regardless of the appellant's claims of defective service, the appellant nevertheless "chose to answer, and it cannot now, after voluntarily appearing, avoid the consequences of its choice." *See Wuxi Taihu*, 2014 WL 6792019, at \*10 n.6 (citing *Onda Enters., Inc. v. Pierce*, 750 S.W.2d 812, 813 (Tex. App.—Tyler 1988, orig. proceeding) (per curiam)). As a result, the entirety of the *Wuxi Taihu* court's discussion of the Service Convention is dicta.

---

[18] *See Wuxi Taihu*, 2014 WL 6792019, at \*1.

[19] A courtesy translation of that country's declarations are available on the website of the Hague Conference on Private International Law at http://www.hcch.net/index_en.php?act=status.comment&csid=393&disp=resdn (last visited June 26, 2015).

The other Texas cases cited by the majority and decided by our sister courts also do not concern Article 10(a).  *See In re J.P.L.*, 359 S.W.3d 695 (Tex. App.—San Antonio 2011, orig. proceeding [mand. denied]); *Velasco v. Ayala*, 312 S.W.3d 783 (Tex. App.—Houston [1st Dist.] 2009, no pet.).[20]  As in *Wuxi Taihu*, the issue in *Velasco* and in *J.P.L.* concerned service of process in a country that has made a formal declaration of opposition to Article 10.  Specifically, both *Velasco* and *J.P.L.* concerned service in Mexico.[21]  Like the *Wuxi Taihu* opinion, the *Velasco* opinion cites Article 5 as authority for the proposition that service by mail does not comply with the Service Convention.  *See Velasco*, 312 S.W.3d at 794.  In *J.P.L.*, the authoring court interpreted Article 19 of the Service Convention.  *See J.P.L.*, 359 S.W.3d at 707.  Thus, in none of the Texas state decisions cited by the majority was the question of the correct interpretation of Article 10 even before the court.  These cases accordingly add nothing to the majority's analysis—which make its failure to address the reasoning of the cases that actually do address that question and follow the prevailing view and all the more puzzling.

## VI. CONCLUSION

For the reasons stated herein, I would conclude that Article 10(a) of the Service Convention permits service by mail in Canada.  Because the majority does not, I respectfully dissent.

/s/    Tracy Christopher
        Justice

Panel consists of Justices Christopher, Donovan, and Wise (Donovan, J., majority).

---

[20] *See ante*, at ___.

[21] A courtesy translation of Mexico's "declarations made at the moment of accession" is available on the website of the Hague Conference on Private International Law at http://www.hcch.net/index_en.php?act=status.comment&csid=412&disp=resdn (last visited June 26, 2015).